UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES STROW, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 21-cv-5104 |
| v. | ) ) | Hon. Steven C. Seeger |
| B&G FOODS, INC., | ) ) | |
| Defendant. | ) ) ) | |

### MEMORANDUM OPINION AND ORDER

Butter is magic on a stick. As this Court's grandmother used to say, butter makes nothing worse, and makes almost everything better. Spread on a fresh baguette, melted over mashed potatoes, or baked into a flaky croissant, butter makes everything it touches turn to golden goodness. It's the Midas of condiments.

Few words in the English language are more alluring than "butter," and for good reason. Most of us have a hard time resisting anything associated with butter. And, when it comes to promoting food, marketers want to be on Team Butter. Sex sells, but butter is a close second.

This case is about the allure of butter, and the deception of fake butter products. Charles Strow bought "Butter No-Stick Spray," sold under the Crisco brand by B&G Foods. To his surprise, the product – a non-stick cooking spray – did not contain any butter. He bought a can of butterless butter spray.

Instead of going back to the grocery store and getting his money back, Strow went to the federal courthouse. He sued B&G for deceptive advertising. B&G, in turn, moved to dismiss. B&G thinks that it was obvious that the butter spray was butterless.

For the following reasons, the Court denies Defendant's motion to dismiss.

**Background**

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Before getting into Strow's purchase of a butterless butter spray, the Court will start with the legal landscape for the protection of consumers when it comes to labeling.

Consumers want to know that they are getting what they think they're buying. That's especially important when consumers put the products inside their bodies.

To that end, federal and state regulations prohibit false and deceptive practices when labeling food and beverages. *See* Am. Cplt., at ¶ 4 (Dckt. No. 7). The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") also protects consumers when they buy products like B&G's spray. *Id.* at ¶ 5.

The integrity of butter is heavily guarded with regulations. People have a love affair with butter. And people want to know if they're getting the real thing. Congress established a definition of butter because consumers value it so much. *Id.* at ¶ 7. It's the only food with its own statutory definition. *Id.* at ¶ 6; *see also* 21 U.S.C. § 321a.

Butter is so popular that it has inspired imposters. Food companies have developed synthetic, butter-like products made from plants and animal fats, hoping to expropriate the allure of butter. *See* Am. Cplt., at ¶ 8 (Dckt. No. 7). The knock-offs include familiar kitchen staples like vegetable oils and margarine. *Id.* at ¶ 9. Manufacturers continually try to sell imitation

products by giving consumers the impression that they contain butter. *Id.* But in reality, the products contain lower-quality and cheaper vegetable oils, not butter. *Id.*

The FDA wants a readily navigable butter landscape. It has long provided guidance to reflect consumer appreciation for butter and dairy. *Id.* at ¶ 10. Agency compliance guidelines state that the FDA considers false and misleading any product labeled "Butter \_\_\_\_\_" or using the word "butter" in conjunction with its name "unless all of the shortening ingredient is butter." *See* Food & Drug Admin., Compliance Policy Guide (CPG) § 505.200: "Butter" Featured in Product Name (Mar. 8, 1988); *see* Am. Cplt., at ¶ 11 (Dckt. No. 7).

The Complaint alleges that consumers prefer butter to phony alternatives, for several reasons. *See* Am. Cplt., at ¶ 12 (Dckt. No. 7). For one, butter is natural. It is made from churning cow's milk, so it is rich in nutrients, like calcium, Vitamin A, and Vitamin D. *Id.* at ¶ 17. We're mammals – we're hard-wired to like dairy – and butter comes from mammals.

Substitute products rely on ingredients that are not cow-made. Substitutes require processes called fat hydrogenation (which helps solidify oils) and interesterification (which can turn oils into solid and semi-solid products by combining them with other solid fats). *Id.* at ¶¶ 14–16. The processes are as unnatural as the words sound. But butter is all natural, and "does not contain the trans fats of vegetable oils." *Id.* at ¶ 13.

Taste matters, too. Butter has a creamy, sweet taste. Vegetable oils, on the other hand, do not. *Id.* at ¶¶ 18–19. And although vegetable oils are "refined, bleached and deodorized" to neutralize their taste, the taste cleansing doesn't always work. *Id.* at ¶ 19. Sometimes vegetable oils oxidize, which reverts the flavor back to the original crude oil before it was processed. *Id.* at ¶¶ 20–21. Far from buttery, oxidized vegetable oil can taste "beany," powdery," or "fishy." *Id.* at ¶ 22.

People can taste the difference between butter and oil. If there was a "Pepsi Challenge" for butter vs. oil, it wouldn't be close.

The differences also matter in the kitchen. *Id.* at ¶ 26. In food parlance, the term "buttery" is a compliment. *Id.* at ¶ 25. Think of your favorite breads and pastries. Cooking with butter creates a flaky texture that is softer and less dense than anything vegetable oils can achieve. *Id.* Far from "buttery," vegetable oils contribute to a waxy mouthfeel and leave an unpleasant aftertaste. *Id.*

Every self-respecting baker knows the difference between butter and oil, in taste and in performance. Butter just tastes different – better – than oil. Butter performs differently, too. Oil is 100% fat and 0% water, but butter is only 80% fat and has 15% water (give or take). The presence of water strengthens the gluten in flour, which impacts the tenderness and density of whatever you take out of the oven. Water also evaporates during the baking process, creating butter's inimitable flakey texture. The water turns to steam when it heats up in the oven, creating a leavening effect in baked goods. *Watch generally* America's Test Kitchen, *How to Make the Flakiest Biscuits Ever*, YouTube (May 15, 2020), https://youtu.be/oUkmTHA7AEw?t=91.

This case involves artificial butter. Defendant B&G Foods manufactures, labels, markets, and sells a product called "Butter No-Stick Spray." *See* Am. Cplt., at ¶ 1 (Dckt. No. 7). Plaintiff Charles Strow bought a can of B&G's butter spray on more than one occasion between July and August 2021. *Id.* at ¶ 68. He paid at least $3.49 per 6 ounces. *Id.* at ¶¶ 53, 71. He alleges that B&G's representations on the label are misleading because the product contains no butter and instead uses artificial butter ingredients.

4

To understand Strow's allegations, the Court turns to B&G's Butter No-Stick Spray. The product looks like this:



As the reader can see, the largest word on the label is "Butter." *Id.* at ¶ 2. It is front and center, in big font. And notice the stacking of the text. "Butter" appears on top (as it often does), above "No-Stick Spray." "Butter" is bigger, in a different font. It pops.

Notice that the label uses a noun, not an adjective. The front of the spray can says "Butter," not "Buttery." The noun communicates that it *is* butter, not that it has a butter-like attribute.

Not far away is the image of a pancake, sizzling in a skillet, with a pat of butter plopped right on top. *Id.* at ¶ 3. It's a yellow can, too, shaped kind of like a stick of butter. It doesn't take too much imagination to think that the good people at Crisco have somehow figured out how to put a nozzle on a stick of butter itself.

5

The product's front label also states that it contains "Natural & Artificial Flavor." *Id.* at ¶ 29. That text appears immediately next to the product's "Butter" title. But it is smaller than the "Butter" text, and in a hazy font. *Id.* at ¶¶ 30–32. It is less noticeable.

To be fair, the front of the can also says "0g Trans Fat," "For Fat Free Cooking," "0g Sat Fat," and "0 Calories." The text is small print, so maybe an average consumer would have trouble seeing it. Still, anyone who spots that text should have a moment of pause. Butter isn't lacking in fat and calories. That's why it's so good. It could suggest that Crisco had created a miracle: fat-free, calorie-free butter. But that's an issue for a later day.

The product's back label, reproduced in the images below, provides more information. *Id.* at ¶ 27. It includes a short list of ingredients. *Id.* The product contains canola oil, soy lecithin, natural and artificial flavor, dimethyl silicone, beta carotene, and propellant – but no butter. *Id.* In fact, the product has none of the ingredients that Congress requires in its statutory definition of butter. *Id.* at ¶ 40. Butter was supposed to be the star of the show, but it is entirely missing from the stage.



In fact, the back label touts the absence of butter from the product. A bolded font reads "Buttery Flavor For Your Food Without The Butter." *See* Def.'s Mtn. to Dismiss, at 3 (Dckt. No. 15). Notice the dairy dissonance: the front of the can said "Butter," but the back of the can said "Without The Butter." It's butter without the butter.

Below that phrase, the back label highlights the spray's versatility. Using the spray can will allow a hungry consumer to do all sorts of things that a cook could do with butter. Examples include making waffles, eggs, toast, pancakes, grilled cheese sandwiches, stir fry, and whatever else the aspiring cook can dream up. *Id.* at 4.

Finally, the back label provides nutritional information, comparing the spray to butter and margarine. *See* Am. Cplt., at ¶¶ 44, 47 (Dckt. No. 7). The serving size of butter and margarine is one tablespoon, or 14 grams. But the serving size of B&G's spray is only 0.25 grams, meaning the amount of spray that would shoot out in one second. *Id.* at ¶ 46. The point seems to be that, when greasing your pans, you could use a little spray, or a lot more butter.

B&G sells other no-stick sprays, like an olive oil spray. *Id.* at ¶ 41. But unlike its butterless butter spray, B&G's olive oil spray actually contains its namesake ingredient. *Id.* And competitor products (*i.e.*, other butter-spray products) prominently feature "butter *flavored*" identifications. *Id.* at ¶ 42 (emphasis added).

Strow alleges that he expected the "Butter No-Stick Spray" to contain butter. *Id.* at ¶¶ 69–72. He thought he was getting a can of sprayable butter when he bought a can of butter spray.

Strow was disappointed to learn that it did not include butter. *Id.* at ¶ 73. He doesn't give the backstory about his disappointment. Maybe he had heated up the waffle iron, and was ready and raring to go, until he discovered the absence of butter in the can, and had to go with

Plan B for breakfast. In any event, Strow claims that the product's packaging misled him and other consumers.

Strow claims that he never would have bought the product if he had known the butterless truth – or at least, he would have paid less. *Id.* at ¶ 73 ("Plaintiff would not have purchased the Product if he knew the representations were false and misleading."); *id.* at ¶ 75 ("Plaintiff . . . would not have paid as much absent Defendant's false and misleading statements and omissions.").

According to the complaint, reasonable consumers rely on a manufacturer to describe a product, especially when distinguishing the product from alternatives. *Id.* at ¶ 49. As Strow sees it, B&G used deceptive practices to sell more of the spray than it otherwise would have sold, and at a higher price. *Id.* at ¶ 51. The complaint alleges that other reasonable consumers would not have purchased the butterless butter spray, either. *Id.* at ¶¶ 50, 52.

Strow alleges that he had a choice between B&G's spray and other sprays that were lower-priced or that "did not misrepresent their attributes." *Id.* at ¶ 74. On multiple occasions, he chose B&G's spray. *Id.* Maybe the taste didn't bother him, because he kept buying it.

In the future, Strow hopes to purchase the product again. But he wants assurances that the product's representations are consistent with the fact that there is no real butter in the spray. *Id.* at ¶ 76. So, he now knows that the spray butter is butterless, but he wants the company to tell him that it contains no butter.

Disappointed with his purchase, Strow filed suit against B&G. *See* Cplt. (Dckt. No. 1). He later amended his complaint. *See* Am. Cplt. (Dckt. No. 7). He brings this putative class action on behalf of himself and "[a]ll persons in the State of Illinois who purchased the Product during the statute of limitations for each cause of action alleged." *Id.* at ¶ 77.

8

Plaintiff's complaint contains six counts: (1) a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; (2) a violation of comparable statutes from other states; (3) breaches of express and implied warranties of merchantability, and a violation of the Magnuson Moss Warranty Act; (4) negligent misrepresentation; (5) fraud; and (6) unjust enrichment. *Id.* at ¶¶ 85–111.

B&G moves to dismiss. *See* Def.'s Mtn. to Dismiss (Dckt. No. 15).

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### Analysis

Strow claims that the labeling on B&G's spray was false and intended to deceive consumers in violation of the ICFA and comparable statutes from other states, state law express and implied warranties of merchantability, and the Magnuson Moss Warranty Act. He also claims that the labeling resulted in tortious negligent misrepresentation, common-law fraud, and unjust enrichment.

B&G makes one overarching argument that hovers over all of the claims. The company argues that the complaint fails to adequately allege that the product's label would deceive a reasonable consumer. *See* Def.'s Mtn. to Dismiss, at 5 (Dckt. No. 15). According to B&G, "[b]ecause Plaintiff's claims are all based on the same facts, they all fail together." *Id.* (citing *Zahora v. Orgain LLC*, 2021 WL 5140504 (N.D. Ill. 2021)). The company raises no alternative arguments to challenge the other claims. So the Court will consider only whether Plaintiff has plausibly alleged a claim under the ICFA.

To state a claim under the ICFA, Strow must allege: (1) a deceptive act or practice, (2) an intent for the consumer to rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage that was (5) proximately caused by the deception. *See Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005); *see also Zahora*, 2021 WL 5140504, at *3.

To satisfy step one, Strow must plead facts plausibly showing a deceptive act or practice. "[A] statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2011). Specifically, Strow must plausibly allege that the statement was "likely to deceive a reasonable consumer." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). And because every claim in Plaintiff's complaint requires proof of a deceptive act or practice, the entire complaint rises or falls with step one. No deception, no claims.

This Court may dismiss an ICFA claim at the pleading stage if the statement at issue is not misleading as a matter of law. *See Bober*, 246 F.3d at 940. But the Seventh Circuit has cautioned that courts should not readily jump to conclusions at this stage. The Seventh Circuit favors a "practical and fact-intensive approach." *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468,

478 (7th Cir. 2020). More specifically, this Court may dismiss a claim at the pleading stage only "where plaintiffs base deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising." *Id.* at 477–78; *see also Bober*, 246 F.3d at 940 (dismissing a claim of deceptive advertising because the product's label "eliminates any possibility of deception" and "can only be read" in a nondeceptive way).

"The statute allows a plaintiff to premise her claim on either deceptive conduct or unfair conduct (or both), but 'the two categories have different pleading standards.'" *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (citation omitted). "If the claim rests on allegations of deceptive conduct, then [Federal Rule of Civil Procedure] 9(b) applies and the plaintiff must plead with particularity the circumstances constituting fraud." *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019).

Alleging a fraud claim is a tall order. Strow must identify the "who, what, when, where, and how" of the alleged deception. *Id.*

The basic issue is whether it is unreasonable as a matter of law to believe that a can of butter spray contains butter. B&G argues that the label on the butterless butter spray is not misleading, and no reasonable consumer could think otherwise.

**I.      The Label**

B&G basically argues that Strow is relying on an unreasonable reading of the label on its can of spray butter. Boiling it down, B&G thinks that it was unreasonable to read the word "Butter" to mean butter. B&G points to the nature of butter itself, the product's back label, and the product's front label. *See* Def.'s Mtn. to Dismiss, at 7–12 (Dckt. No. 15).

11

The Court sees things differently, literally and figuratively. If B&G didn't want consumers to think that the can contained butter, one wonders why it said "Butter," front and center.

## A. The Properties of Butter

B&G begins with first principles about butter. At room temperature, butter is a solid. Solids can't be sprayed. But the spray can said "Butter No-Stick Spray." Given this "factual impossibility," B&G argues that no consumer could reasonably believe that a sprayable product contains butter. *Id.* at 6. Spraying butter is impossible, and it is unreasonable to expect the impossible.

B&G compares butter to unrefined sugar. *See Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751 (N.D. Ill. 2015). *Ibarrola* involved a granola product advertised as containing "no refined sugars." *Id.* at 754. Plaintiff, a granola purchaser, claimed that she had understood "no refined sugars" to mean that the product "contain[ed] only naturally occurring, unrefined sugar" – *i.e.*, sugar that had not been refined at all. *Id.* at 755–56.

The court held that no reasonable consumer could be deceived by the product's statement because "sugar cane in its natural state is a grass" that is "indigestible." *Id.* at 756–58. Raw sugar is not suitable for human consumption without at least some refinement. So no reasonable consumer could think that the sugar in the product was in its natural, completely unrefined state. *Id.* at 757. Plaintiff's interpretation of the label was unreasonable.

According to B&G, it is equally implausible that a consumer could think that butter comes in a spray can. Butter is a solid at room temperature. And no reasonable consumer could think that a solid gets sprayed out of a nozzle. *See* Def.'s Mtn. to Dismiss, at 7 (Dckt. No. 15).

Butter and sugar make a good pairing, but here, the two don't fit together. Most people have seen melted butter. And melted butter is a liquid. So, most people have seen butter in liquid form. Maybe the liquid butter isn't at room temperature – give it time, let it cool down, and it will transform into a solid. Still, butter in a liquid form exists.

If you asked your Average Joes on the street if butter can be a liquid, plenty of them probably would say yes. Anyone who has ever enjoyed crab legs or popcorn will probably have a quick response. At the very least, it is not so far outside the realm of possibility that it fails to state a claim.

The parties engage in a long debate about the how-to's of converting butter into liquid. Plaintiff believes that butter can become a liquid at room temperature by adding the ingredient "butteroil or anhydrous milk fat." *See* Pl.'s Resp., at 2 (Dckt. No. 25). B&G responds that the complaint makes no reference to anhydrous milk fat, so anhydrous milk fat can't come to the complaint's rescue. *See* Def.'s Reply, at 6 (Dckt. No. 27). Then, B&G argues that "[b]ecause anhydrous milk fat is not butter, Plaintiff's new argument that he thought the product was made from anhydrous milk fat is just an admission that he thought the product was not composed of butter." *Id.*

The debate about the transformative abilities of butter can wait. Maybe butter cannot remain a liquid at room temperature without the addition of some additive, such as butteroil or anhydrous milk fat. But for now, Strow's reading of the spray can is not so unreasonable that he must lose, here and now.

Reasonable consumers are not chemists. The law does not expect consumers to be well-versed in butter's thermodynamic properties. *See Rudy v. Fam. Dollar Stores, Inc.*, 2022 WL 345081, at *4 (N.D. Ill. 2022) ("What matters most is how real consumers understand and react

13

to the advertising.") (quoting *Bell*, 982 F.3d at 476); *see also Lederman v. Hershey Co.*, 2022 WL 3573034, at *3 (N.D. Ill. 2022) ("While Plaintiff may have an acute sense of fudge, is the reasonable consumer as discerning? Not likely.").

Life experience matters most to the reasonable consumer. Most people have probably melted butter in their microwaves. And when they were done, they probably didn't believe that they had achieved the impossible.

Maybe, if they stopped to think about it, consumers would realize that butter is a solid at room temperature. Still, it is not "unreasonable or fanciful" for a consumer to believe that butter can exist in liquid form at room temperature. *See Bell*, 982 F.3d at 477. It is not as if the spray can told consumers that it could help them fly.

### B. The Back of the Can

Next, B&G turns the bottle around and points to language confirming that its product contained no butter. In its view, a consumer could not reasonably believe that the can contained butter after reading the back label.

The back of the can includes the following statement: "Buttery Flavor For Your Food Without The Butter."[1] *See* Def.'s Mtn. to Dismiss, at 7, 11 (Dckt. No. 15). Notice the shift from

---

[1] Plaintiff argues that the Court may not consider this statement because the Amended Complaint "does not reference" that particular part of the label. *See* Pl.'s Resp., at 2 (Dckt. No. 25). That is incorrect. In considering a motion to dismiss, a court may consider "documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment."). Here, Plaintiff refers to both sides of the label in his complaint. *See* Am. Cplt., at ¶¶ 2, 27 (Dckt. No. 7). And even where a document is not incorporated by reference, a court may consider it on a motion to dismiss if it is integral to the complaint. *See Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 881 (7th Cir. 2022). Plaintiff's complaint is all about the label. Plaintiff may not attempt to "evad[e] dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proves his claim has no merit." *Brownmark Films*, 682 F.3d at 690 (cleaned up); *see also Campbell v. Drink Daily Greens, LLC*, 2018 WL 4259978, at *2 (E.D.N.Y. 2018) (taking judicial notice of portions of a label that plaintiff had failed to include in the complaint).

14

a noun to an adjective. The front of the can says that it contains "Butter." The back of the can says that the contents add "buttery" flavor.

Not far below, the label compares the spray to butter and oil. It shows that the spray has fewer calories. *Id.* at 9. And the list of ingredients confirms that it contains no butter. *See* Am. Cplt., at ¶ 27 (Dckt. No. 7) (listing canola oil, soy lecithin, natural and artificial flavor, dimethyl silicone, beta carotene, and propellant).

B&G argues that the Court should take this back-label information into account. The company observes that all information that is available to a consumer is fair game when deciding whether a product is deceptive. *See* Def.'s Mtn. to Dismiss, at 7 (Dckt. No. 15) (citing *Davis*, 396 F.3d at 884); *see also Bell*, 982 F.3d at 477 ("We stand by the general principle that deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used.").

Here, according to B&G, a consumer only needs to look at the back label to realize that there's no butter in the product. And the company notes that Strow claims to have read the nutrition chart, which is printed on the back label. *See* Def.'s Mtn. to Dismiss, at 7–9 (Dckt. No. 15); *see also* Am. Cplt., at ¶¶ 43–47 (Dckt. No. 17). If that's the case, then he could not plausibly have believed that the spray contained butter. *Id.*

Maybe so. But the Seventh Circuit has limited the ability of truthful information on a product's back label to immunize deceptive advertising contained on the product's front label. *See Bell*, 982 F.3d at 476. In *Bell*, the Seventh Circuit held that a plaintiff's claim survives a motion to dismiss "if [he has] plausibly alleged that the [defendant's] front labels likely lead a significant portion of reasonable consumers to falsely believe something that the back labels belie." *Id.* at 476.

15

*Bell* involved a label that read "100% Grated Parmesan Cheese." *Id.* But the product contained other ingredients, too: cellulose powder and potassium sorbate. Plaintiffs claimed that many consumers interpreted the "100%" label as applying to all three words (*i.e.*, the product was 100% cheese). *Id.* at 476–77. The Seventh Circuit reversed the dismissal of plaintiffs' complaint, even though the back label accurately listed those non-cheese ingredients.

The Seventh Circuit held that "the reasonable consumer standard does not presume, at least as a matter of law, that reasonable consumers will test prominent front-label claims by examining the fine print on the back label." *Id.* at 477. So, where a product's front label is ambiguous, its back label won't save the day at the pleading stage.

Anyone who has quickly picked up a can of soup from a grocery-store shelf will know why. Consumers don't study grocery labels like books in a library. *See id.* at 476 ("Many reasonable consumers do not instinctively parse every front label or read every back label before placing groceries in their carts."). And the law of the Seventh Circuit doesn't expect them to.

Here, the product's front label dooms B&G's motion. The largest word on the can (besides the "Crisco" logo) is "Butter." *See* Am. Cplt., at ¶ 2 (Dckt. No. 7). The only image on the product depicts a melting pat of butter atop pancakes in a skillet. A consumer pushing his cart down the aisle confronts only this imagery and labeling during the few seconds spent deciding whether to purchase the product.

Strow claims that he and other consumers interpret that label as promising actual butter in the product. *Id.* at ¶ 39. That claim is not an "unreasonable or fanciful interpretation" of the label. *See Bell*, 982 F.3d at 477; *see also id.* at 493 (Kanne, J., concurring) ("It's well settled that a label is not deceptive as a matter of law when the plaintiff's interpretation is so facially illogical, implausible, or fanciful that no reasonable consumer would think it – and that dismissal

16

is warranted in those circumstances."). If the product's labeling looks like melted butter and says "Butter," it's not unreasonable for a consumer to believe that it contains butter. Why else call it "Butter"?

Only when inspecting the back label would a consumer realize that "Butter" might not mean actual butter.[2] But again, the Seventh Circuit shies away from allowing back-label disclaimers to exonerate front-label deceptions as a matter of law. *See id.* at 477 (majority opinion) ("The ambiguity rule for front-label claims would, we fear, encourage deceptive advertising and labeling."). Product manufacturers should not say one thing to a consumer on the front while crossing their fingers behind their back (label). *See id.*; *see also Dumont v. Reily Foods Co.*, 834 F.3d 35, 41 (1st Cir. 2019); *Mantikas v. Kellogg Co.*, 910 F.3d 633, 638–39 (2d Cir. 2018); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008).

### C. The Front of the Can

B&G ends where it all began: the front of the can.

The complaint points to the small hazy text next to the word "Butter." It reads "Natural & Artificial Flavor." *See* Def.'s Mtn. to Dismiss, at 8 (Dckt. No. 15); Am. Cplt., at ¶ 29 (Dckt. No. 7). It is smaller than the "Butter" lettering, and it is set in thinner, less-contrasting font. But it's there.

According to B&G, the phrase "Natural & Artificial Flavor" could mean only one thing: the spray is butter *flavored* and not actually butter. *Id.* And the company points out that Strow

---

[2] To be sure, the back label touts the absence of butter in the product and highlights the product's nutritional advantages over butter. But if the label does not actually mislead consumers, B&G can make that showing later. *See Bell*, 982 F.3d at 478 ("[N]othing we say in this opinion is intended to foreclose defendants from offering evidence to show that consumers are not actually misled by their '100% Grated Parmesan Cheese' labels.").

17

does not explain what he thought that phrase modified, if not the word "Butter." *Id.* So Strow could not have reasonably believed that the product contained any real butter. *Id.*

Again, consumers are not judges. This Court will "not impose on average consumers an obligation to question the labels they see and to parse them as lawyers might for ambiguities, especially in the seconds usually spent picking a low-cost product." *See Bell*, 982 F.3d at 476; *see also id.* ("The district court's dismissal erred by departing from the Rule 12(b)(6) standard and attributing to ordinary supermarket shoppers a mode of interpretation more familiar to judges trying to interpret statutes in the quiet of their chambers."); *see also Dumont*, 934 F.3d at 40 (noting that a reasonable consumer is not an "erudite reader of labels, tipped off by the accent grave on the word 'crème,' and armed perhaps with several dictionaries, a bit like a federal judge reading a statute").

Strow puts forward some arguments why the text is confusing and insufficient to disclose to consumers that the product in fact contains no butter. He claims the font is small, or at least, "smaller than what is required by FDA regulations." *See* Am. Cplt., at ¶ 30 (Dckt. No. 7). And he points out that the text's font does not contrast with the background color, making it difficult to read or even notice. *Id.* at ¶ 31. Finally, he contends that the phrase "is not linked to the Product's characterizing flavor, which appears to be butter." *Id.* at ¶ 32.

It is plausible that a consumer who sees the word "natural" next to "butter" would expect to find natural butter in the product. What's more, the phrase "Natural & Artificial Flavor" next to "Butter" could mean different things to different consumers. Maybe it means that the can contains butter, and some artificial flavors.

At bottom, B&G is trying to change "butter" to "buttery." But a noun is a noun, and an adjective is an adjective. A noun is a thing, and an adjective describes a thing. The spray can

18

didn't say that the contents were buttery. The spray can said that the thing inside was butter. The plain language reading of the text was not implausible.

Unlike other products, this product didn't say that it had X-flavor. It said that it *contained* X. *See Zahora*, 2021 WL 5140504, at *4–5 (holding that the plaintiff failed to plausibly allege that a product labeled "Vanilla Bean Flavor" would lead a reasonable consumer to believe the product's flavor was derived from mostly natural or all natural ingredients).

B&G's argument highlights what the label does *not* say. It does not say "Butter flavored," unlike competitor products. *See* Am. Cplt., at ¶ 41 (Dckt. No. 7). It says "Butter." And then, in a different font, and somewhat above and away from that word, it says "Natural & Artificial Flavor."

Later, B&G can offer evidence that the spray can would not mislead a reasonable consumer. A jury can provide a definitive answer to that question, but this Court will not. *See Bell*, 982 F.3d at 478; *see also Dumont*, 934 F.3d at 41 ("[W]e think it best that six jurors, rather than three judges, decide."). Strow's reading is not so implausible that it fails to state a claim.

So, much like its spray, B&G's motion does not stick. The motion to dismiss the complaint based on the argument that the complaint did not meet the plausibility standard is denied.

## Conclusion

For the foregoing reasons, the motion to dismiss is denied.

Date: September 30, 2022

Steven C. Seeger
United States District Judge

19