# EXHIBIT 1

1              CHARLES STROW

2       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
3

4

5   CHARLES STROW individually and
    On behalf of all other similarly
6   situated,                        Case No.: 1:21-CV-05104
                    Plaintiffs,
7   vs.                              Judge Steven C. Seeger
    B&G Foods, Inc.
8             Defendant.

9   _____/

10

11  The Above-Captioned Video-Recorded Zoom Deposition of

12              CHARLES STROW

13     1:40 p.m. - 4:04 p.m. Central Standard Time

14           Thursday, December 15, 2022

15

16

17

18

19

20

21

22

23  REPORTED BY:

24  STEVEN POULAKOS, RPR

25  JOB NO:  220572

1                          CHARLES STROW

2

3

4

5

6

7

8

9

10              The above-captioned video-recorded

11    deposition of CHARLES STROW was held via Zoom

12    videoconference on Thursday, December 15, 2022,

13    commencing at 1:40 p.m., Central Standard time before

14    Steven Poulakos, Notary Public.

15

16

17

18

19

20    REPORTED BY:  Steven Poulakos, RPR

21

22

23

24

25

```
 1                        CHARLES STROW

 2   APPEARANCES:

 3        ON BEHALF OF THE PLAINTIFFS:

 4        SPENCER SHEEHAN, ESQ.

 5             Sheehan & Associates, P.C.

 6             60 Cutter Mill Road

 7             Great Neck, NY 11021

 8

 9

10

11        ON BEHALF OF THE DEFENDANT:

12        DAVID KWASNIEWSKI, ESQ.

13        MATTHEW BORDEN, ESQ.

14             Braunhagey & Borden, LLP

15             351 California Street

16             San Francisco, California 94104

17

18

19

20

21

22

23

24   ALSO PRESENT:  RICK RICHEY, THE VIDEOGRAPHER

25
```

1                          CHARLES STROW

2                              INDEX

3                  Deposition of CHARLES STROW

4                       December 15, 2022

5     Examination by:                              Page

6     Mr. Borden                                      6

7

8     Exhibit No.                                Marked

9     Exhibit 1      Motion to withdraw              11

10    Exhibit 2      A label                          28

11    Exhibit 3      A message from Sheehan & Associates    38

12    Exhibit 4      A label Crisco                    58

13    Exhibit 5      A chart, reason for buying        59

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      CHARLES STROW
 2       A       No, not whatsoever.
 3       Q       And you're represented by counsel here
 4  today?
 5       A       Yes, sir.
 6       Q       And that's Mr. Sheehan?
 7       A       That's correct.
 8       Q       And where are -- and Mr. Sheehan is not in
 9  the room with you?  He's in another location; is that
10  correct?
11       A       Yes, he is.
12       Q       Okay.  So do you have any other lawyers
13  representing you in this case?
14       A       No, sir.
15       Q       Have you ever heard of someone named Peter
16  S. Lubin?
17       A       No, sir.
18       Q       I take it you've never met anyone named
19  Peter S. Lubin?
20       A       No, sir.
21       Q       You never signed an engagement letter with
22  Peter S. Lubin?
23       A       No.  I have no idea who that is, sir.
24       Q       You've never talked to Peter S. Lubin?
25       A       No, sir.
```

1                          CHARLES STROW

2          Q          You didn't agree in writing for him taking

3      any share of fees in this case, correct?

4          A          Again, I don't know who he is, no, sir.

5          Q          How about Francis R. Green, have you ever

6      talked to him?

7          A          No.  I've never talked with Mr. Francis,

8      no.

9          Q          And I take it Francis R. Green, you've

10     never signed any agreement with him, correct?

11         A          No, sir.

12         Q          And how about Patrick Austermuehle, do you

13     know who that is?

14         A          No.  No, sir.

15         Q          I'm going to show you a document.  So this

16     is going to be the first document that I show you.

17     Hopefully I will be able to do it in a decent way.

18     It's a little bit awkward sometimes on these Zoom

19     depositions, so bear with me for one sec.

20         A          Sure.

21         Q          It's also compounded by the fact that I

22     don't see very well.  So I think I'm going to try to

23     drop it into the chat.  So did the document show up in

24     the chat?

25         A          Let me check.

1                    CHARLES STROW

2        Q        You don't have to do that because I'm going

3    to share screen with you, so you can see it.  I'm more

4    asking for -- of your counsel, Mr. Sheehan.

5                 MR. SHEEHAN:  I see it and, yes, I'm going

6    to take a look at it even though I know you said that

7    you would drop it.

8                 MR. BORDEN:  Okay.

9    BY MR. BORDEN:

10       Q        So can you see the document now, Mr. Strow?

11       A        Yes, sir.

12                MR. BORDEN:  Can we have this document

13   marked Exhibit 1, please, Mr. Court Reporter?

14                 (A discussion was held off the record.)

15                 (Strow Exhibit 1 was marked for purposes of

16   identification.)

17   BY MR. BORDEN:

18       Q        Let me just identify the document for the

19   record.  Exhibit 1 is a document entitled, motion to

20   withdraw and it's been filed in this case.  So I'm

21   going to scroll down and you'll see it says Peter S.

22   Lubin and Patrick Austermuehle here -- hereinafter

23   referred to as movants seek leave of court to withdraw

24   as attorneys of record in this action for plaintiff,

25   Charles Strow, and it goes on.

1                              CHARLES STROW

2                    Do you see that, Mr. Strow?

3           A        Yes, sir, I see that.

4           Q        Did you see this document before it was
5    filed?

6           A        I have not seen the document, no, sir.

7           Q        Did you consent in writing to allow Patrick
8    S. Lubin and Patrick Austermuehle to withdraw as your
9    counsel?

10          A        I don't know who they are, so I don't -- I
11   didn't speak with them, so --

12          Q        And from your answer, I take it you don't
13   know whether this motion was granted or not?

14          A        This is the first time I've seen anything
15   like this, so --

16          Q        And do you have any idea why your counsel
17   withdrew?

18          A        The only thing that I can see that I do
19   know on this is when me and Spencer I think filed
20   first, it was with J.M Smucker and I think the name
21   changed with the corporate maybe.  That's the only
22   thing that I see different is now it's B&G, but I know
23   first we did do J.M. Smucker, I believe, is what my
24   first document paper says.

25          Q        I understand, but in terms of these lawyers

```
 1                      CHARLES STROW
 2   you have --
 3        A      I have --
 4        Q      -- you have no idea why they withdrew?
 5        A      Correct.
 6        Q      So I take it from -- you've read your
 7   complaint in this case, right?
 8        A      Yes, sir.
 9        Q      And I take it from your complaint that you
10   bought the spray oil several times?
11        A      No.  I bought it one time.
12        Q      When did you first review your complaint in
13   this case?
14        A      Whenever it said the J.M Smucker.  I
15   haven't looked at anything since then.  Just when it
16   was first -- I think first filed I guess maybe back in
17   September area I believe it was, I think.
18        Q      Did you review it before it was filed or
19   after it was filed?
20        A      No.  We had a discussion the night before I
21   believe it was filed.
22        Q      And then you looked it over to make sure
23   that it was correct and accurate?
24        A      To the best of my knowledge, yes.  There
25   was a lot of stuff that I didn't understand with that,
```

```
 1                    CHARLES STROW

 2      A       Yes, sir.

 3      Q       Where were you?

 4      A       I was -- I believe I was at Jewel, Jewel

 5   Osco which is our grocery store here.  I guess I was

 6   probably in the oil aisle is where I guess I was.

 7      Q       So you anticipated my next question which I

 8   appreciate.  How was it displayed?  Was it just there

 9   next to the other oils?

10      A       It was actually -- Jewel has it propped up.

11   I don't know if they still do.  They change stuff

12   around all the time, but Jewel has -- you had your more

13   natural like your coconut oils on the right-hand side.

14   Then they had the butter spray besides it and then they

15   had the vegetable oils kind of on the left-hand side.

16   So it looked more natural.  It looked -- it had butter

17   on it.  That's again all I -- that's all I use.  That's

18   all I was raised with, so that was why I grabbed that.

19              I even -- I came home that night and I

20   think I made grilled cheese one night.  And instead of

21   using butter, I sprayed the butter spray on the grilled

22   cheese.  And I wish I wouldn't have done that because

23   what I know now, I just wish I wouldn't have done that.

24   So I'm just putting it in oil or something.

25      Q       So you didn't like the grilled cheese when
```

1                         CHARLES STROW

2   you ate it?

3        A        It was all right.  Just when you find out

4   something is not what it portrays, that has a big issue

5   with me, so --

6        Q        Is that when you found out?

7        A        No.  That's not when I found out, no.

8        Q        So it was performing like spray oil?

9        A        It was performing like nonstick oil,

10  correct.

11       Q        And you didn't have any problem with the

12  way it was working at the point in time when you first

13  used it?

14       A        The working part is not my issue, sir, no,

15  sir.

16       Q        Just to -- just to -- it did everything you

17  expected out of a spray oil, correct?

18       A        Correct, yes.

19       Q        And when did you become dissatisfied with

20  the product?

21       A        I was -- I believe I was on Facebook and I

22  was talking to some friends, whatever.  And for some

23  reason, I want to say Spencer's name was on Facebook

24  and I came across it.  And that's when I was reading

25  about it and I was like what is this.  So I pulled it

CHARLES STROW

1

2    up.  I read about it.  Then after I read about it, I

3    actually done some Google and research and I was

4    reading about this.  And I was like you've got to be

5    kidding me.

6              And that's when I actually -- I think I sat

7    for maybe a day or so and I was like I'm going to go

8    ahead and fill this out and contact him and see what

9    the deal is with this.  And the more I was researching,

10   the more I was reading about it, that's when I was

11   realizing that's not what it says it is.  I never knew

12   that, so --

13        Q    So thank you for that.  We'll talk more

14   about the materials that you received from Mr. Sheehan

15   and I appreciate that.

16              Just in terms of -- so you were using it

17   for a period of time before Mr. Sheehan reached out and

18   contacted you?

19        A    Off and on, yes.

20        Q    About how long was that?

21        A    I mean, I still had the can for well over a

22   year, year and a half at least.  So I don't use it all

23   the time, but I've I used it every so -- every now and

24   then, but it lasted over a year I would say at least,

25   so --

CHARLES STROW

1

2      Q        And you had no reason to believe that it

3  didn't contain butter during that year and a half?

4      A        I did not know that, yes.  I never looked

5  at the ingredients whatsoever.

6      Q        Okay.  Going back to this first purchase,

7  you said it was on a shelf and there were some other --

8  was it next to other spray oils?

9      A        Yes.  It was all with the spray oils, but,

10  again, the way it was arranged was they had the butter

11  spray that was kind of close to the coconut oil, the

12  more natural oils.  Then they had the vegetable oils

13  and the off brand stuff on the left-hand side over a

14  little bit.  So that's when I was looking at things and

15  that's why I chose the butter spray because it stood

16  out and that was butter.  That's what I bought it for,

17  so --

18      Q        Sure.  Were there other butter flavored

19  spray oils that were up there on the shelf at the time?

20      A        Yeah.  They all said butter.  I forget how

21  they worded it.  Buttery flavored -- flavored I believe

22  is what it said.  It said butter flavored or butter

23  imitation, but they let you know that it was not

24  butter.  This had nothing to do with that.  It

25  literally said butter spray.  And with technology these

```
 1                     CHARLES STROW
 2   two completely different stories.  And I'm not trying
 3   to stop people from buying this product.  This product
 4   will be a good product.  It's the labeling that I had
 5   an issue with.  And I'm wholehearted about this.  In my
 6   opinion, this is very misleading in my opinion because
 7   the front of the can does not match what the back of
 8   the can says.
 9              The can on the front has a large picture.
10   It's a large butter picture and it says largely butter.
11   On the back of the can in little tiny writing is
12   completely opposite of what the front of the can is
13   portraying.  And I'm not trying to get people not to
14   buy this.  I want the labeling to be correct to quit
15   misleading people is what I want.
16       Q       Okay.  We'll get there too, but just to go
17   back about this particular feature of the product, this
18   comparison chart.  Excuse me.  In that period of time
19   between the purchase and then the year, the year and a
20   half when you got the message from Mr. Sheehan on your
21   Facebook account, you didn't read any of this language
22   and you didn't rely on this language and you're not
23   claiming that you were injured by any of this language,
24   correct?
25       A       That is correct.
```

```
 1                    CHARLES STROW
 2      Q      And also just to be clear, when I said this
 3 language, you understood me to be referring to the
 4 language in Exhibit 2, correct?
 5      A      Yes, sir.
 6      Q      So I just dropped Exhibit 2 into the chat.
 7 So you referenced earlier you use social media; is that
 8 correct?
 9      A      I do, yes, sir.
10      Q      Which social medias do you use?
11      A      Mostly just Facebook.  I have Snapchat.  I
12 barely ever use that.  I'm mostly a Facebook person or
13 I'm a local news person too.
14      Q      And you said you first became involved in
15 this case when you received a solicitation from a
16 lawyer that went out to you through Facebook?
17             MR. SHEEHAN:  Objection.  That misstates
18 the record, but please continue, Mr. Borden.
19 BY MR. BORDEN:
20      Q      So that's a good -- I don't know what --
21 from time to time, your lawyer may object and we didn't
22 talk about this when I was telling you how this process
23 works, but unless he instructs you not to answer, you
24 should answer the question.  I believe that you've
25 probably forgotten the question at this point because
```

Page 34

                              CHARLES STROW

1

2    we're talking back and forth and, you know, that's

3    fine.  That happens, but --

4              MR. BORDEN:  Anyway, Mr. Court Reporter, do

5    you mind reading back the question for Mr. Strow,

6    please?

7         (Reporter read back the record as requested.)

8              THE WITNESS:  In my opinion, I would not

9    call it a solicitation, but, yes, I did -- I did see

10   a -- an ad.  It was him I believe asking if we -- if we

11   had this product or if we ever purchased this product

12   and if we knew what it had in it compared to what it

13   says.  And that got my attention and I started

14   researching a little bit looking and comparing what it

15   had and what it was portraying to me what I thought it

16   had was completely opposite.  So that was when I was

17   made aware of that, correct.

18   BY MR. BORDEN:

19        Q     So it's fair to say that you didn't intend

20   to sue Smucker or B&G Foods until you received this

21   solicitation from your lawyer, correct?

22              MR. SHEEHAN:  Objection again to the --

23   what I believe to be misstating the record.

24              However, Mr. Strow, please answer.

25              THE WITNESS:  Sure.  Again, I don't -- I

```
                                                          Page 35
 1                      CHARLES STROW
 2   don't know how to say this.  I kind of forgot the
 3   question, but can you repeat the question for me?  I'm
 4   sorry.
 5   BY MR. BORDEN:
 6       Q     Sure.
 7             MR. BORDEN:  Can you please read it back,
 8   Mr. Court Reporter?
 9         (Reporter read back the record as requested.)
10             THE WITNESS:  That is partially correct.
11   Again, I didn't know anything was wrong with the
12   product.  I didn't know they were misleading and
13   mislabeling until I read about that.  That's what got
14   me into wanting to pursue this was the mislabeling.
15   It's not the product is bad.  It's nothing to that
16   effect.  It's the whole purpose of misleading the
17   labeling is what my issue is, so --
18   BY MR. BORDEN:
19       Q     But it's fair to say that you had no intent
20   of suing my client until you received this
21   communication from your lawyer?
22       A     I guess you could say that's correct, yes.
23       Q     Is there any way that that's incorrect?
24       A     No, sir.
25       Q     And did you receive this communication from
```

CHARLES STROW

1

2      A      I don't recall that, no.  I just remember

3   after researching a few things, I remember going back.

4   I don't remember if it came back on my Facebook again

5   or if went to that on Facebook.  I don't recall.  And I

6   know I hit the sign up or something to that effect or

7   whatever it was or contact me or whatever.  I don't

8   know what it said.

9      Q      So what did you think that join this

10  investigation -- what did you think join the

11  investigation meant?

12     A      That means to me that they are diving into

13  what they're exactly saying that the butter does not

14  contain butter spray as what it says on the front label

15  is what I take as what probably most consumers do take

16  it as.  It's not portraying what it is.  That's what

17  I'm guessing to that, so --

18     Q      And when you saw this, you understood that

19  this was less of an investigation and more of an effort

20  by your lawyer to recruit someone to bring a lawsuit?

21              MR. SHEEHAN:  Objection, leading question.

22              However, Mr. Strow, please answer.

23              THE WITNESS:  Yes, sir.  No.  I did not

24  think that, no.

25  BY MR. BORDEN:

Page 40

CHARLES STROW

1

2      Q       So you at least understood that this was

3   asking you to be a plaintiff in a lawsuit against a

4   company that sells spray, correct?

5      A       No, I had no clue.  No, sir.

6      Q       And I take it you subsequently talked to

7   Mr. Sheehan after -- after -- you responded to this

8   message that's in Exhibit 3, correct?

9      A       Yes, I did.

10     Q       And what kind of response did you make?

11  Was it like a button that you clicked on like that sign

12  up button down here or was there something else?

13     A       I'm not going to say that it was contact

14  us, but I'm not for sure.  But I hit that and it led me

15  to a document that I filled out.  And it was just my

16  name, address and then it asked my history with the

17  product or I don't know how it was -- I don't know

18  words, but -- and then I submitted it to them.

19     Q       So after clicking on this, did you become

20  part of any type of investigation?

21     A       My information went to him.  I don't know

22  what it was for.  I had -- I was guessing that it was

23  for an investigation of the product.  Nowhere on here

24  does it say class action.  Nowhere on here does it say

25  lawsuit, nothing to that effect.  I didn't know who he

```
 1                        CHARLES STROW
 2   was at the time either, but I was just going on based
 3   on what the ad says.  I was very, very upset because
 4   again I was misled and I was unhappy with that, so --
 5        Q       Are you aware of any testing that's been
 6   done as part of this investigation?
 7        A       No, I'm not.
 8        Q       Are you aware of any survey that's been
 9   done as part of this investigation?
10        A       No, I'm not.
11        Q       Can you just look at the ingredients and
12   see that there's no butter?
13        A       You can see that it's not portrayed of what
14   the front of the can says, yes.
15        Q       Are you aware of any app other than simply
16   reading the ingredients that was part of this
17   investigation?
18        A       I'm sorry.  What was your question?  You
19   broke up.  I'm sorry.
20        Q       I'm sorry.  Are you aware of any app other
21   than just simply reading the ingredients of the product
22   and comparing it to what was on the front of the label
23   that was part of this investigation?
24        A       Did I know that?
25        Q       No.  I'm trying -- and I'm sorry and --
```

1                        CHARLES STROW

2          A        I apologize for not understanding.  I'm

3    sorry.

4          Q        No.  You don't need to apologize.  I want

5    to make sure that you understand because that's how we

6    make sure that we're getting accurate testimony.  I'm

7    seeing in Exhibit 3 that there's this request to join

8    the investigation and I guess my question was:  You

9    know, are you aware of any part of this investigation

10   that was done other than simply, you know, looking at

11   the ingredients on the one hand, looking at the front

12   of the label on the other hand and saying, hey, the

13   front of the label says butter, the ingredients don't

14   say butter, something's going on?

15         A        When I signed up for that, it was -- it was

16   to make myself aware of what this situation was and

17   what it was -- what was going to happen next.  That's

18   the reason I hit that.  There was nothing ever

19   discussed with anything of -- and I'm not aware of any

20   testing that was done afterwards because his office

21   contacted me directly afterwards.  So I spoke with his

22   office directly.  So, no, I'm not aware of any tests

23   that were done, no, sir.

24         Q        And, yeah.  I'm just including tests or any

25   other things that, you know, could be part of an

1                        CHARLES STROW

2    know it asked my name, my phone number, my address.

3          Q       Okay.  And I'll just call it kind of a

4    intake form.  Is that a fair characterization of it?

5          A       I guess.  I don't know why it's called

6    intake form.  I don't know what to call it.  I have no

7    clue.

8          Q       Okay.  I'll just call it a form.  So you

9    get the form from your lawyer.  You fill it out.  What

10   happened next in terms of your relationship with your

11   lawyer?

12         A       I got -- I think I got an email, but I

13   don't recall.  I don't recall what it said.  I don't

14   remember, but I remember I spoke with his paralegal

15   within a couple of weeks, I believe, maybe not even

16   that long.

17         Q       What was his paralegal's name?

18         A       I don't recall.  She was a female.  I know

19   that.  She might not even be a paralegal.  I'm guessing

20   at that.  It was a lady that worked in his office,

21   so --

22         Q       And what did she say on the phone call?

23         A       I don't recall word-for-word at all.

24         Q       Do you recall --

25         A       Go ahead.

```
 1                    CHARLES STROW
 2        Q        Go ahead.
 3        A        I believe I was talking about the next
 4   steps in the process, so what they were needing to do
 5   and wanted my opinion on things.  And that's I think --
 6   I think that's when I found out there was a class
 7   action that possibly was going to happen.
 8        Q        Is there anything else that you can
 9   remember that you said or she said during this
10   conversation with this person from Mr. Sheehan's
11   office?
12        A        I literally do not remember that
13   conversation.  I just remember it was a lady that I
14   spoke with.  I don't remember that conversation
15   whatsoever.
16        Q        And after you had this conversation with
17   her, what was the next step?
18        A        I didn't hear from anything for a while.
19   And then if I'm not mistaken, maybe Mr. Sheehan called
20   me.  I don't recall.  I don't remember, so --
21        Q        So you had put your contact information
22   into the form?
23        A        Correct.
24        Q        And when you had the conversation with
25   someone from his office, this woman called you; is that
```

Page 57

CHARLES STROW

1

2    convenient for me.  That was the reason -- one of the

3    reasons why I chose that.  It's just more convenient,

4    yeah.

5         Q    And were you buying my client's butter for

6    the nutrient content?

7         A    No.  I only was buying it for butter.  That

8    was the only -- the wholehearted reason.

9         Q    Why weren't you concerned about the

10   nutritional content of the product?

11        A    That's something I don't look at.  I

12   usually try to buy the same things over and over again.

13   If I was worried about that, I would have been looking

14   at the back of the can.  I just -- butter is what

15   I'm -- what I was raised with.  Butter is all I've

16   known.  When I saw that, I was comfortable with that

17   because that's what I was looking at, yeah.

18        Q    I mean, you know how to look at the

19   nutritional facts on butter, right?

20        A    I never do.  I never have, but, yes, I do.

21        Q    Right.  There's like a little nutrition

22   facts panel either on the side or the back depending on

23   the product?

24        A    Correct.

25        Q    And how about calories, do you care about

1                          CHARLES STROW

2    calories?

3         A     I don't ever look at those on cans.  Again,

4    I make -- a lot of my things are homemade, so I don't

5    ever look at stuff like that.  I don't buy canned

6    stuff.  I don't buy stuff out of boxes.  I try to make

7    my stuff homemade.  So I don't ever look at any kind of

8    values on anything that I buy.

9         Q     Okay.  I'm going to show you another

10   document hopefully.

11              MR. BORDEN:  So let's mark this Exhibit 4,

12   please.

13              (Strow Exhibit 4 was marked for purposes of

14   identification.)

15   BY MR. BORDEN:

16        Q     I'll share my screen with you.  Can you see

17   it?

18        A     Yes.  I can see it now, yes, sir.

19        Q     Exhibit 4 for the record is labeled Crisco.

20   It's an image of Crisco butter flavored -- naturally

21   and artificial flavored no-stick spray.

22              Do you see that?

23        A     If I look closely, I can -- I can't even

24   read the middle part between the butter and no-stick.

25   I don't know what that says.  I cannot read that at

```
 1                        CHARLES STROW
 2    all.   Maybe if I zoom in, yeah, then I can read it,
 3    yes.
 4         Q     Okay.  Good.  And let me just ask you is
 5    this a true and correct copy of the label of the
 6    product that you purchased?
 7         A     To my knowledge, yes.
 8         Q     So -- and this has the image of the pancake
 9    with the pat of butter on it that you talked about?
10         A     Yes, correct.
11         Q     And then down here, you see some
12    nutritional information, but you didn't look at that,
13    correct?
14         A     That is correct, yes.
15         Q     So let me show you another document.  We'll
16    make this Exhibit 5.
17               (Strow Exhibit 5 was marked for purposes of
18    identification.)
19    BY MR. BORDEN:
20         Q     Do you have Exhibit 5?
21         A     Yes, sir, I do.
22         Q     And it says, reasons for buying the product
23    on top and then there's some categories below.
24               Do you see that?
25         A     Yes, sir, I do.
```

```
 1                        CHARLES STROW
 2   right.   That should be good.
 3                MR. SHEEHAN:  Yeah.  Let me download it
 4   again.
 5                MR. BORDEN:  Okay.  Sorry for the delay,
 6   folks.
 7                THE WITNESS:  No problem.
 8   BY MR. BORDEN:
 9        Q      Okay.  So I believe you talked about some
10   other kind of spray oil products that you bought before
11   you bought my client's product.  Do you remember what
12   any of those were?
13        A      One is just the coconut oil.  That's all it
14   is.  It's just coconut oil.  I think the other one is
15   like an extra virgin olive oil that's in a spray, I
16   believe.  That's the only two that I've used, so --
17        Q      And after you were contacted by Mr. Sheehan
18   and you learned that this product doesn't have butter,
19   did you continue to use the spray oil that my client
20   sells?
21        A      Negative, no.
22        Q      Did you throw out the can that you had or
23   did you save it?
24        A      I threw it out.  I don't save cans.
25        Q      And it wasn't finished?  You still had some
```

```
 1                    CHARLES STROW
 2   but I'm going to get a little bit more detail from you.
 3   Is it your claim that you suffered some kind of injury
 4   from buying this product?
 5        A      I didn't suffer a natural injury, no.
 6        Q      We've been going for about an hour.  Do you
 7   want to take another break?  I don't know -- let's go
 8   off the record and talk for a sec.
 9                THE VIDEOGRAPHER:  3:59 p.m. central
10   standard time.  We're off the record.
11                (Deposition recessed at 3:59 p.m.)
12                (Deposition resumed at 4:02 p.m.)
13                THE VIDEOGRAPHER:  4:02 p.m. central
14   standard time.  We're back on the record.
15                MR. BORDEN:  So, Mr. Strow, we just had a
16   discussion off the record and what we decided is given
17   the lateness in the day and obligations that you have
18   and the fact that, you know, we started this deposition
19   late due to my own fault, we're going to continue the
20   deposition to another time that all of us will find
21   convenient and -- and you're free to go take care of
22   what you need to take care of.
23                THE WITNESS:  I appreciate that.  And I
24   apologize.  I feel like it's my fault, so I apologize.
25                MR. BORDEN:  No problem.  The lawyers will
```

Page 95

1                    CHARLES STROW

2    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

3             I, Steven Poulakos, registered Professional

4    Reporter, the officer before whom the foregoing

5    proceedings were taken, do hereby certify that the

6    foregoing transcript is a true and correct record of

7    the proceedings; that said proceedings were taken by me

8    stenographically and thereafter reduced to typewriting

9    under my supervision; and that I am neither counsel

10   for, related to, nor employed by any of the parties to

11   this case and have no interest, financial or otherwise,

12   in its outcome.

13           IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 28th day of

15   December 2022.

16   My commission expires:

17   August 20, 2023

18

19   ----------------------------
      STEVEN POULAKOS, RPR
20   NOTARY PUBLIC IN AND FOR

21   THE STATE OF MARYLAND

22

23

24

25