**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Charles Strow, individually and on behalf of all others similarly situated, | Case No.: 1:21-cv-05104 |
| Plaintiff, | Judge Steven C. Seeger |
| – against – | |
| B&G Foods, Inc., | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE THE DECLARATION OF ANDREA LYNN MATTHEWS, PH.D.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTS ........................................................................................................................... 2

ARGUMENT .................................................................................................................. 4

I.      DR. MATTHEWS' METHODOLOGIES ARE UNRELIABLE ....................................... 4

        A.      Dr. Matthews Attempted to Manipulate the Results of Her Survey by Introducing
                Bias at Every Stage ........................................................................................... 5

                1.      Dr. Matthews Improperly Primed the Participants ..................................... 5

                2.      Dr. Matthews Showed Participants Improper Stimulus for Experiment 1 . 6

                        a.      Dr. Matthews Compared Two Fictional Labels and Never Used the
                                Real Label of the Product at Issue ................................................. 7

                        b.      The Stimulus Dr. Matthews Used Artificially Focused Participants
                                on one Part of the Label ................................................................. 8

                3.      The Stimulus in Experiment 2 Is Invalid Because Participants in this
                        Experiment Were Not Shown Any Label ................................................ 10

                4.      Experiment 2 Is Also Invalid Because the Instructions and Table in
                        Condition 2 Conflicted with One Another ............................................... 10

                5.      The Survey Used Leading Questions ....................................................... 11

        B.      The Survey Failed Use Proper Controls ........................................................... 11

II.     THE SURVEY IS NOT USEFUL ................................................................................ 12

III.    DR. MATTHEWS' OPINIONS LACK A RELIABLE SCIENTIFIC
        FOUNDATION ...................................................................................................... 13

IV.     CONJOINT ISSUE ........................................ **ERROR! BOOKMARK NOT DEFINED.**

CONCLUSION ............................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

**CASES**

*Am. Footwear Corp. v. Gen. Footwear Co.*,
609 F.2d 655 (2d Cir. 1979)..................................................................................... 9

*Am. Honda Motor Co. v. Allen*,
600 F.3d 813 (7th Cir. 2010) .................................................................................... 4

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
627 F. Supp. 2d 384 (D.N.J. 2009) ........................................................................... 8

*Burns v. Sherwin-Williams Co.*,
2022 WL 4329417 (N.D. Ill. Sept. 18, 2022) ..................................................... 4, 13

*Competitive Edge, Inc. v. Staples*,
763 F. Supp. 2d 997 (N.D. Ill. 2010) ...................................................................... 10

*Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*,
448 F. Supp. 3d 965 (N.D. Ind. 2020) .................................................................... 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)................................................................................................... 4

*E.E.O.C. v. Dial Corp.*,
2002 WL 31061088 (N.D. Ill. Sept. 17, 2002) ......................................................... 6

*Evory v. RJM Acquisitions Funding LLC*,
505 F.3d 769 (7th Cir. 2007) .................................................................................... 4

*FTC v. Nat'l Urological Grp, Inc.*,
2017 WL 6759868 (N.D. Ga. Oct. 10, 2017) ............................................................ 6

*Gopalratnam v. Hewlett-Packard Co.*,
877 F.3d 771 (7th Cir. 2017) ........................................................................ 4, 13, 14

*Hill's Pet Nutrition, Inc. v. Nutro Prods, Inc.*,
258 F. Supp. 2d 1197 (D. Kan. 2003)................................................................ 12, 13

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014)....................................................................... 14, 15

*In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*,
2017 WL 1196990 (N.D. Ill. Mar. 31, 2017)...................................................... 5, 15

*Jones v. Conagra Foods, Inc.*,
2014 WL 2702726 (N.D. Cal. June 13, 2014) ........................................................ 15

*Kargo Global, Inc. v. Advance Magazine Publ'rs, Inc.*,
2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) .......................................................... 9

*Manpower, Inc. v. Ins. Co. of Pa.*,
732 F.3d 796 (7th Cir. 2013) .................................................................................. 14

*Muha v. Encore Receivable Mgmt., Inc.*,
558 F.3d 623 (7th Cir. 2009) .................................................................................. 4

*Native Am. Arts, Inc. v. Bud K World Wide, Inc.*,
2012 WL 1833877 (M.D. Ga. May 18, 2012) ........................................................ 10

*Scotts Co. v. United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002) .................................................................................. 9

*Simon Property L.P. v. MySimon, Inc.*,
104 F. Supp. 2d 1033 (S.D. Ind. 2000) ................................................................. 12

*Sines v. Darling Ingredients, Inc.*,
2023 WL 3841741 (D.N.J. June 6, 2023) .............................................................. 14

*Spraying Sys. Co. v. Delavan, Inc.*,
975 F.2d 387 (7th Cir. 1992) .................................................................................. 4

*THOIP v. Walt Disney Co.*,
690 F. Supp. 2d 218 (S.D.N.Y. 2010) .................................................................... 8

*Uncommon, LLC v. Spigen, Inc.*,
305 F. Supp. 3d 825 (N.D. Ill. 2018) ..................................................................... 5

*Wallace v. Countrywide Home Loans, Inc.*,
2012 WL 11896333 (C.D. Cal. 2012) ..................................................................... 10

*Wasson v. Peabody Coal Co.*,
542 F.3d 1172 (7th Cir. 2008) ................................................................................ 13

*Weaver v. Champion Petfoods USA Inc.*,
2019 WL 7370374 (E.D. Wisc. Dec. 31, 2019) ...................................................... 13

*Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*,
521 F.3d 790 (2008) ............................................................................................... 14

**RULES**

Federal Rule of Evidence 702 .................................................................................... 4
Federal Rule of Evidence 703 .................................................................................. 13

**OTHER AUTHORITIES**

Manual for Complex Litigation (Fourth) § 11.493 ...................................................... 5

Defendant B&G Foods, Inc. ("B&G Foods") respectfully submits this memorandum in support of its Motion to Exclude the Declaration of Andrea Lynn Matthews, Ph.D.

## INTRODUCTION

Plaintiff seeks to offer testimony by Andrea Lynn Matthews, Ph.D. to support his class certification motion. Her testimony should be excluded.

The thesis of Plaintiff's case—that consumers were materially misled by the absence of the word "flavor" adjacent to the word "butter" on the front of B&G Foods's butter-flavored no-stick spray—is easy to test. (Expert Declaration of Robert Palmatier, Ph.D ("Palmatier Decl."). You show one group of consumers the actual label, show another group the same label with the word "flavor" added, and ask both groups the same non-leading questions about the product. (*Id.*) Such a study controls for one factor— the word "flavor"—and does not introduce any bias.

Instead of constructing a simple and honest study, Dr. Matthews fashioned an elaborate survey (actually two surveys with four groups of respondents), that introduced bias at every stage. First, she primed all participants with an unnecessary "distractor task" to key them into the purpose of the survey. In Experiment 1, she used two labels, neither of which was the label of the accused product, made multiple changes in the images shown to each group so that it is impossible to isolate the purported effect of any factor, and used leading stimuli and questions. In Experiment 2, she did not even use the label, deploying, instead, leading questions and a table that conflicted with one another.

From this, Dr. Matthews seeks to offer conclusions about the actual product without having reviewed any of the evidence in the case—including the actual product labels—or studying the market or why people buy no-stick spray. Dr. Matthews admits none of her surveys

1

shows whether the absence of the word "flavor" has any effect on price or demand for the product, but asserts she could figure this out at some later date from evidence she does not have.

Dr. Matthews engaged in these machinations because if you show one group the label at issue and show another the same label with the word "flavor" prominently displayed, and ask each group how much it is willing to pay and how interested they are in buying the product—two simple non-leading questions—it shows that adding the word "flavor" makes no difference to consumer behavior. (Palmatier Decl. ¶¶ 43-74.) In fact, consumers slightly prefer the product with the word flavor on it (*id.*), which should come as no surprise because the product at issue is a butter substitute—another fact Dr. Matthews did not consider.

Each one of Dr. Matthews' techniques—proffered by an individual whom no Court has ever found to be an expert—is not scientifically valid, and is, standing alone, a basis to exclude her testimony under Rule 702. Her declaration contravenes basic principles of marketing science and established case law precluding the use of biased surveys and should not be admitted.

## FACTS

The Complaint alleges that Plaintiff purchased a can of Crisco® Butter No-Stick Spray Oil. Prior to February 2022, the label stated on the front: "Butter No-Stick Spray," "0 calories," "0g sat fat," and "✓For Fat Free." The side stated: "Buttery Flavor For Your Food Without The Butter" and contained a comparison of the product's fat and calories with those in butter. The can also stated "Natural and Artificial Flavor" on the upper right front/side of the label.

The Complaint alleges that this label caused Plaintiff to believe that the product contained butter, that "the Product is required to be identified as an artificially butter flavored no-stick spray" and that "Consumers are misled because competitor products are prominently identified as 'butter flavored.'" (Compl. ¶¶ 28, 42.)

In support of his motion for class certification, Plaintiff submitted the declaration of Dr. Matthews. No court has ever accepted Dr. Matthews' testimony or found her to be an expert. (Matthews Dep. at 10-11.) Dr. Matthews has no experience working in the field of advertising or marketing. (*Id.* at 11.) Dr. Matthews has never published any papers in any major scientific or trade journals. (*Id.* at 11-13.) Dr. Matthews is not a tenured professor in the field and her dissertation was not about false advertising of consumer packaged goods. (*Id.* at 13-14.)

Dr. Matthews did not review any of the evidence in the case. (Matthews Dep. at 20-23, 62.) The only thing she claims to have seen is the Complaint. Her opinion is based exclusively on online surveys that she created. In the surveys, consumers were first given what she calls a "distractor task," in which they were asked a series of questions about a fictional bacon-flavored spray oil. Then she conducted two different surveys. In the first ("Experiment 1"), she showed one group of consumers Condition 1, the image appearing on page 34 of her declaration, and another group Condition 2, the image appearing on page 36 of her declaration, and asked both groups the same questions. In Experiment 2, she showed two different groups of consumers questions and tables without images of the product. Condition 1, which was shown to one group, appears on pages 42 of her declaration, and Condition 2 appears on page 43.

Dr. Matthews opines that she could determine how much "consumers would be willing to pay for butter flavored non-stick cooking spray that they believed contained butter, compared to those that did not contain butter" by constructing either a "conjoint analysis" or a "hedonic analysis." (Matthews Decl. ¶¶ 166-69.) Her conjoint analysis would be based on a survey asking consumers to rate the importance of four product attributes: "Brand," "Price," "Size," and "whether the product contained butter." (*Id.* at ¶ 181.) Her proposed hedonic analysis would involve looking that the sales and price data of "various" different products. (*Id.* at ¶¶ 188-89.)

## ARGUMENT

Pursuant to Federal Rule of Evidence 702, expert opinion testimony is inadmissible unless: "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court instructed that courts must act as "gatekeepers" to prevent the introduction of improper opinions. "In performing its gatekeeper role under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Burns v. Sherwin-Williams Co.*, 2022 WL 4329417, at *16 (N.D. Ill. Sept. 18, 2022) (Seeger, J.) (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (cleaned up)). At the class certification state, the district court "must perform a full *Daubert* analysis before certifying the class if the situation warrants." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010).

## I. DR. MATTHEWS' METHODOLOGIES ARE UNRELIABLE

Dr. Matthews' conclusions are based exclusively on her surveys. She did not make any effort to assess the market or examine any of the evidence in this case, including the actual product labels. The survey itself contravenes basic principles of marketing science.

For a consumer survey to be admissible, it "must comply with the principles of professional survey research," *Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007). It should not rely upon "leading or suggestive" questions. *Muha v. Encore Receivable Mgmt., Inc.*, 558 F.3d 623, 625-26 (7th Cir. 2009). A reliable survey must "replicate market conditions" and remain free of bias. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 396 (7th

Cir. 1992). "Courts in this district have supplemented" these "general principles" with seven factors listed in the Manual for Complex Litigation (Fourth) § 11.493, including whether 'the questions to be asked of interviewees were framed in a clear, precise and nonleading manner," if "sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted," and "the objectivity of the entire process was ensured." *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 849-50 (N.D. Ill. 2018); *In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*, 2017 WL 1196990 *28 (N.D. Ill. Mar. 31, 2017) (Dow, J.). At her deposition, Dr. Matthews agreed with these principles.[1] Yet her methodology violates them all.

### A. Dr. Matthews Attempted to Manipulate the Results of Her Survey by Introducing Bias at Every Stage

Dr. Matthews' survey repeatedly used leading or confusing questions and sought to introduce bias in multiple ways. It is hornbook law that these techniques render surveys inadmissible. *See*, *e.g.*, Manual for Complex Litigation (Fourth) at 103 (admissibility depends on, *inter alia*, "whether the questions asked were clear and not leading" and "whether the process was conducted so as to ensure objectivity").

### 1. Dr. Matthews Improperly Primed the Participants

Before beginning the substance of her survey, Dr. Matthews primed the participants with a gratuitous "distractor task" that focused participants on the characteristic of "flavor." (Palmatier Decl. ¶¶ 80-84.) This bias, alone, renders Dr. Matthews' survey inadmissible.

"Priming" refers to the creation of a situation "that will influence someone's views or opinions," such as by "asking questions or presenting information that will influence the way

---

[1] Matthews Dep. at 29 (no leading question), 30-31 (demand bias should be avoided), 32 (surveyor should avoid disclosing subject of survey), 31-32 (surveys should make every reasonable effort to duplicate market conditions).

respondents will answer subsequent questions." *E.E.O.C. v. Dial Corp.*, 2002 WL 31061088 *11 (N.D. Ill. Sept. 17, 2002) (Urbom, J.). Priming is one way to skew the results of a survey, and renders the survey invalid. *FTC v. Nat'l Urological Grp, Inc.*, 2017 WL 6759868, at *43 (N.D. Ga. Oct. 10, 2017) (excluding survey that was biased because expert "primed and telegraphed to consumers researchers' interests, thus skewing the results").

The Matthews survey primed consumers by asking them a series of questions about a fictional "bacon-flavored" no-stick spray that mentioned the word "flavor(ed)" at least four different times. (Palmatier Decl. ¶ 81.) This taught participants to focus on flavor before answering the real survey questions about "butter flavor," which "introduces an unknown bias into all of the results that cannot be determined or removed and makes the survey result unreliable and invalid." (*Id.* ¶ 84.)

There was no need for a distractor task. (Palmatier Decl. ¶ 83.) Such tasks are only used when it is necessary to conceal the purpose of a survey, and participants had no reason to know the purpose of Dr. Matthews' survey (before doing the "distractor task," that is). (*Id.*) Further, "distractor tasks are not related to the focal issue being studied to prevent priming." (*Id.*) Indeed, at her deposition, Dr. Matthews was unable to identify any support for using a distractor task that involved the same subject matter as the survey. (Matthews Dep. at 50.) She also admitted that the survey could have been performed without the distractor task. (*Id.* at 52-53.) That the use of this "task does not follow accepted scientific research principles and was included without a methodological reason makes the purpose of its inclusion suspect." (Palmatier Decl. ¶ 84)

### 2. Dr. Matthews Showed Participants Leading Stimulus in Experiment 1

Another fatal flaw in the Matthews Survey is that Dr. Matthews used improper stimulus. Experiment 1 is supposed to be a comparison between how consumers react to the product label in the Complaint versus how consumers understand the product if it is marked as "butter flavor."

The first invalidating feature of her survey is that the image in Condition 1 is not an accurate depiction of the product. As a result, she never showed any participants in her survey the actual label in question. Constructing a survey in this manner makes no sense if you are trying to figure out how consumers react to the accused product, and could only have been done to bias the results. Second, the stimulus in Experiment 1 is leading because it focuses the participants on one portion of the label in a way that consumers never experience when actually making purchasing choices. Third, the stimulus presented in Experiment 2 did not have an image of the product, which does not replicate how consumers experience buying it. Each of these methodologies separately invalidates the survey.

a.    **Dr. Matthews Compared Two Fictional Labels and Never Used the Real Label of the Product at Issue**

As seen in Palmatier Decl. ¶ 86, the call-out that Dr. Matthews showed participants in her Experiment 1, Condition 1 contains different language than what appeared on the actual product.

**Actual Label**

**Dr. Matthews' Survey**




No product ever sold under the Crisco brand said "Butter No-Stick Spray" on the front and "naturally and artificially flavored" on the side. (Declaration of Lori Mazuro ¶ 4.) The product Dr. Matthews made up to show survey participants is entirely fictional, which she then compared to another fictional product. No participants in her survey were shown the actual label.

"There is no scientifically valid reason for using different language than what appears on the Product to test consumer perception about the Product." (Palmatier Decl. ¶ 87.) "To test the effect of language on a label, the actual label must be used. No valid conclusion can be derived from substituting language that does not appear on the label in question." (*Id.*) This design choice, by itself, invalidates the Matthews Survey. *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 238-39 (S.D.N.Y. 2010) (survey excluded when it omitted neck labels and hang tags from t-shirts that consumers would have seen in marketplace) Dr. Matthews, herself, admitted that "if the label actually didn't say naturally and artificially flavored and had different language," it is possible that the result of her survey would change. (Matthews Dep. at 58-59.)

> **b. The Stimulus Dr. Matthews Used Artificially Focused Participants on one Part of the Label**

Surveys should not be leading and should try to mimic the way purchases are made in the real world to the greatest extent possible. The Matthews Survey does neither.

First, the survey presents the labels with the phrase "naturally and artificially flavored" magnified in a cutout that "artificially draws attention to one isolated portion of the label that is focal for the case 'Naturally & Artificially Flavored.'" (Palmatier Decl. ¶ 89.) This leading design biases participants. (*Id.* ¶¶ 89-90.) An objective way to assess the effect of this language would have been to allow respondents to examine the entire label if they wanted and to read whatever parts they chose. This, of course, would have included the language "Butter Flavor For Your Food Without The Butter" and the comparison chart between the product and butter-language that the Matthews survey fails to present, and which Dr. Matthews did not even know existed. (Matthews Dep. at 62.)

Courts have rejected similar techniques. *E.g.*, *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 452-53 (D.N.J. 2009) (survey used cropped and out-of-context

"snippets," and thus it "withheld from the respondents large amounts of other essential visual, contextual and informational portions from the two documents that directly relate to the survey questions"); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (survey inadmissible where, *inter alia*, "the respondents were asked to review only that portion of the bag. The survey thus elicited information about the consumer's reaction to an isolated part of the packaging, when the relevant issue in a false advertising case is the consumer's reaction to the advertisement as a whole and in context."); *see also* (Palmatier Decl. ¶ 89 ("Guidance in survey design, cited by Dr. Matthews, states that, 'a plaintiff must take care not to use one that would draw respondents' attention to the very issues tested in the survey.'") (citing Keller, Bruce P. (2012), "Survey Evidence in False Advertising Cases," in Shari Seidman Diamond and Jerre B. Swann (eds.), Trademark and Deceptive Advertising Surveys: Law, Science, and Design, (Chicago: ABA Publishing), p. 186)).

Dr. Matthews' design is also invalid because "it is not how consumers actually saw the product in the marketplace either on a shelf in a retail store or as a picture of the front of the can in an online retailer setting." (Palmatier Decl. ¶ 89.) Established guidance on design surveys states that "the survey expert must make every reasonable effort to duplicate the marketplace conditions…[n]ot surprisingly, the failure to simulate marketplace conditions is a frequent basis for a *Daubert* challenge."[2] Courts have repeatedly thrown out surveys for this reason. *E.g.*, *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (survey was defective for "failure to conduct it under actual marketing conditions"); *Kargo Global, Inc. v. Advance Magazine Publ'rs, Inc.*, 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) (survey stimulus

---

[2] Edwards, Kip G. (2012), "The Daubert Revolution and Lanham Act Surveys," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (Chicago: ABA Publishing), p. 346.

that draws connections not necessarily made by consumers in the marketplace is inadmissible).
Dr. Matthews, however, agreed that her survey did not present the label as consumers saw it in
the market. (Matthew Dep. 57-58.)

### 3. The Stimulus in Experiment 2 Is Invalid Because Participants in this Experiment Were Not Shown Any Label

For Experiment 2 of her survey, Dr. Matthews did not use any label, which obviously is
not how consumers experienced the product. (Palmatier Decl. ¶ 92.) Because consumers do not
buy spray oil in this manner, this survey is non-probative and inadmissible under the same case
law cited above. (Palmatier Decl. ¶ 95.)

### 4. Experiment 2 Is Also Invalid Because the Instructions and Table in Condition 2 Conflicted with One Another

Experiment 2 is separately invalid because in Condition 2, the participants were told in
the instructions that "Butter Spray B does not contain butter," yet were told in the accompanying
table that Butter Spray B does contain butter. (Palmatier Decl. ¶ 92; Matthew Decl. at page 43;
Matthews Dep. at 86 [admitting that respondents were given "conflicting information in the table
and in the question itself"].) Dr. Matthews admitted that "you can't really know if they relied on
the table or if they relied on the question when analyzing their responses." (Matthew Dep. at 86.)
Questions far less confusing than these have been held to invalidate surveys. *Competitive Edge,*
*Inc. v. Staples*, 763 F. Supp. 2d 997, 1008-09 (N.D. Ill. 2010) (excluding consumer confusion
survey that asked respondents whether they thought calculators "come from a single source"
because it was ambiguous as to manufacturer, store, country of origin, or other potential source);
*Wallace v. Countrywide Home Loans, Inc.*, 2012 WL 11896333 *5 (C.D. Cal. 2012) (questions
about survey respondents' "typical" work week); *Native Am. Arts, Inc. v. Bud K World Wide,*
*Inc.*, 2012 WL 1833877 *8 (M.D. Ga. May 18, 2012) (questions about "illustration" were
impermissibly ambiguous when image included picture text).

### 5. The Surveys Used Leading Questions

The survey compounded the effect of leading stimulus by repeating the words in the questions the survey asks about the label, which Dr. Matthews conceded could render the responses unreliable. (Matthews Dep. at 62.) In the questions in Experiment 1, the survey reiterates and recombines language from the label (such as combining "naturally and artificially flavored" and "no stick butter spray") in a manner that never appeared on the actual labels, and which suggests to participants that the phrases are related and significant. Formulating the questions in this manner makes it impossible to determine whether participants based on their responses on the label or on the language in the questions. (*Id.* at 64-65.)

Dr. Matthews likewise employed leading questions in Experiment 2. This Condition presents consumers with just two options—a spray with butter or one without—which does not emulate market conditions because consumers would typically have more than two options. The presentation of these two options improperly suggests that the butter option would be available at the same price, which is also unrealistic and improperly biases the results because who would not want free butter? (Matthews Dep. at 79.) The question is also phrased in a non-neutral way by gratuitously including the word "artificial," which could have a negative impact on consumers— a possibility for which the survey does not account. (Matthews Dep. at 80-82.)

### B. The Survey Failed Use Proper Controls

The Matthews survey is separately invalid because it failed to use proper controls. In Experiment 1, the survey used a control condition that had three changes to the label: (1) it added the word "flavor" under the word "butter"; (2) changed the callout to read "naturally and artificially **butter** flavored"; and (3) changed the phrasing of the question to add the words "butter" and "flavor." (Matthew Dep. at 75.) As a result of these three changes, it is impossible for the survey to isolate the effect of any single representation. (Matthews Dep. at 75-78.)

11

A survey's failure to use proper controls and isolate what is driving consumer behavior is grounds for its exclusion. *Simon Property L.P.v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1047 (S.D. Ind. 2000) ("By refusing to test whether any possible confusion between these two parties is a result of the competitive proximity between the services offered by SPG and mySimon, or instead the result of mere similarity in names, SPG is refusing to test for truly relevant confusion."); *Hill's Pet Nutrition, Inc. v. Nutro Prods, Inc*., 258 F. Supp. 2d 1197, 1204 (D. Kan. 2003) ("Because the survey made no attempt to distinguish whether the true statement or the allegedly false statement caused the respondent's opinion, the survey is useless to show the cause of any deception."). In this case, Dr. Matthews employed no measures to isolate whether the language at issue actually drives demand for the product, or drives any customer's purchasing decision. (Matthews Dep. at 69-70.)

## II.    THE SURVEY IS NOT USEFUL

At her deposition, Dr. Matthews admitted that her survey does not shed any light on whether having the unmodified phrase "butter no-stick spray" affects consumer behavior. (Matthews Dep. 69-70.) She further admitted that "people could buy the product for any number of reasons," including "taste," "price," "brand awareness," "putting the product on an end cap display in the store," "advertising" and "health concerns." (*Id.* at 70-71.) Her survey thus does not answer any question in this case because even if the results were valid, they would not show whether any consumer was purportedly materially misled.

As one court observed in rejecting similar evidence: "The survey did not purport to show any relation between the falsity, if any, of defendant's advertising, and any decision to purchase by any consumer. No questions were asked about whether the #1 burst would make the consumer more or less likely to buy that product or any of defendant's products, instead of plaintiff's products. For this court to assume that plaintiff has suffered or will suffer any injury whatsoever

12

from the #1 burst would be mere speculation." *Hill's*, 258 F. Supp. 2d at 1207; *Weaver v. Champion Petfoods USA Inc*., 2019 WL 7370374 *4 (E.D. Wisc. Dec. 31, 2019) ("But the Survey does not test the effect of the BAFRINO statements on consumers' purchasing decisions. To do that, the respondents should have first been shown unaltered bags of food and asked what price they would pay for that product. Next, they should have been shown bags with all of the BAFRINO statements omitted and have the same price question put to them.").

Dr. Palmatier used the techniques noted in the opinions above. Dr. Matthews did not. She did not use the actual labels in any of her surveys (Experiment 2 did not use any label at all). She did not ask any of her participants about how much they would pay for the product under any condition or how willing they were to buy it. In doing so, she studiously avoided asking the salient question in this case. Thus, even if her surveys were valid, they would not be useful, which is a separate and independent ground for exclusion. *Burns*, 2022 WL 4329417, at *16 (excluding as unhelpful expert testimony on machine's stopping distance whether there was no evidence "that stopping distance proximately caused the injury").

## III.    DR. MATTHEWS' OPINIONS LACK A RELIABLE FOUNDATION

"Expert testimony must be based on sufficient and known facts." *Constructora Mi Casita*, *S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp. 3d 965, 971 (N.D. Ind. 2020) (citing *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) (evidence of one sale was insufficient basis to calculate an average of sales over twenty years)). "Under Federal Rule of Evidence 703, the facts or data relied upon by an expert must themselves be the kind that 'experts in the particular field would reasonably rely on . . . in forming an opinion on the subject.'" *Gopalratnam*, 877 F.3d at 789 (quoting Fed. R. Evid. 703).

Here, the only thing Dr. Matthews reviewed prior to preparing her survey and report was the Complaint—though, notably, she did not state she reviewed the complaint in her report

(which she testified was complete and accurate), but only stated she did so at her deposition. (Matthews Dep. at 38.) She did not review the actual labels used on the products at issue. (*Id.* at 62.) She did not speak with Plaintiff, review his deposition transcript, or review any other evidence. (*Id.* at 23, 65). Dr. Matthews did not produce any documents she reviewed, and testified she would not rely on any documents other than those in her report. (*Id.* at 20-24.)

Dr. Matthews' failure to review any relevant evidence beyond the self-serving allegations in the Complaint render her opinions little more than inadmissible *ipse dixit*. *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (affirming the exclusion of an expert report when the expert did not disclose the source of his data). Because Dr. Matthews failed to review the actual labels used on the products, and never used any actual labels in her survey, there is no "rational connection between the data and the opinion" that could render the opinion reliable. *Gopalratnam*, 877 F.3d at 781 (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 781 (7th Cir. 2013)). This is a separate and independent basis for excluding Dr. Matthews' testimony.

## IV.   DR. MATTHEWS' "DAMAGES MODELS" SHOULD BE EXCLUDED

Dr. Matthews' "opinions" that she could calculate damages based on a conjoint or hedonic analysis should also be excluded because they are not opinions, but rather a description of what these analyses are without any explanation of how she would try to validly structure them in this case. Courts routinely exclude these types of "boilerplate opinions" because such a "barebones methodology cannot be tested, controlled, or evaluated for errors. *Sines v. Darling Ingredients, Inc.*, 2023 WL 3841741 *11 (D.N.J. June 6, 2023) (excluding appraisal expert who "has not analyzed any diminution in property values, performed any appraisals, or conducted any neighborhood comparisons for the proposed class area"); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 550 (C.D. Cal. 2014) (excluding expert who "describe[d] hedonic regression and conjoint"

analyses but who did "not actually perform either analysis or describe in any detail their specific application to this case").[3]

In *ConAgra*, plaintiff's damages expert asserted that either hedonic or conjoint analysis could calculate damages. The Court held that it was inadmissible because, like the Matthews declaration, it did "not identify any variables he intends to build into the models, nor does he identify any data presently in his possession to which the models can be applied." *Id.* at 552. Dr. Matthews asserts she could construct a conjoint analysis to test for the importance of four product attributes, but does not explain why or how she selected that number, whether that would require multiple surveys, or how the results could be converted into an actual price premium. *ConAgra*, 302 F.R.D. at 551 (simply asserting conjoint analysis could be performed "fails to provide a concrete methodology" for calculating a price premium); *see also In re Fluidmaster*, 2017 WL 1196990, at *30 (excluding conjoint analysis limited to evaluating six product attributes without explanation). Dr. Matthews also admitted that, like Dr. Howlett in ConAgra, she did not have the evidence needed to do the analysis. (Mattthews Dep. at 88-91.)

Dr. Matthews's proposed hedonic analysis is equally vague. She asserts little more than that it could be performed if she had data from "various" other products, but does not identify these other products, what data she would require, or how she could account for other reasons consumers purchase other products. (*Id.*) Indeed, had Dr. Matthews performed even a basic internet search, she would have learned that no hedonic regression would be possible because, in fact, Crisco sells for approximately half the price of its chief competitor, PAM. (Dkt. 71-11.)

---

[3] *See also Jones v. Conagra Foods, Inc*., 2014 WL 2702726 *20 (N.D. Cal. June 13, 2014) (collecting cases) (rejecting similar regression analysis to show damages because "Capps does not provide a clearly defined list of variables, he has not determined whether the data related to any or all of his proposed control variables exists, and he has not determined, or shown how he would determine, which competing and complementary products he would use.").

## **CONCLUSION**

For the foregoing reasons, the Matthews declaration should be excluded.


Dated: August 1, 2023                    Respectfully submitted,

                                         BRAUNHAGEY & BORDEN LLP


                                         */s/ Matthew Borden*
                                         Matthew Borden, Esq. (*Pro Hac Vice*)
                                         David H. Kwasniewski, Esq. (*Pro Hac Vice*)
                                         BRAUNHAGEY & BORDEN LLP
                                         351 California Street, 10th Floor
                                         San Francisco, CA 94104
                                         Telephone: (415) 599-0210
                                         Facsimile: (415) 276-1808
                                         borden@braunhagey.com
                                         kwasniewski@braunhagey.com

                                         Stephen Michael Donnelly
                                         sdonnelly@plgfirm.com
                                         PARIKH LAW GROUP, LLC
                                         150 S. Wacker Drive, Suite 2600
                                         Chicago, IL 60606
                                         Telephone: (312) 725-3476
                                         sdonnelly@plgfirm.com

                                         *Attorneys for Defendant B&G Foods, Inc.*