IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Charles Strow, individually and on behalf of all others similarly situated,<br><br>                          Plaintiff,<br><br>    – against –<br><br>B&G Foods, Inc.,<br><br>                          Defendant. | Case No.: 1:21-cv-05104<br><br>Judge Steven C. Seeger |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE THE DECLARATION OF ANDREA LYNN MATTHEWS, PH.D.**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................................. 1

ARGUMENT ........................................................................................................................................ 3

I.   PLAINTIFF FAILS TO SHOW DR. MATTHEWS' METHODOLOGIES
     ARE RELIABLE ...................................................................................................................... 3

     A.   Plaintiff Fails to Show Dr. Matthews Survey was Unbiased ................................. 3

          1.   Dr. Matthews' Improper Distractor Task ....................................................... 4

          2.   Dr. Matthews' Use of Leading Stimulus in Experiment 1 ........................... 6

               a.   Dr. Matthews' Use of Fictional Labels ............................................ 6

               b.   Dr. Matthews' Artificial Focus on One Part of the Label ............... 7

          3.   Plaintiff Fails to Address Other Sources of Bias in Dr. Matthews' Survey 9

     B.   Plaintiff Fails to Show Dr. Matthews' Survey Used Proper Controls .................... 9

     C.   Dr. Matthews' Survey Is Too Unreliable to be Admissible .................................... 9

II.  PLAINTIFF FAILS TO SHOW THE SURVEY IS USEFUL ......................................... 11

III. PLAINTIFF CONCEDES DR. MATTHEWS' TESTIMONY LACKS A
     RELIABLE FOUNDATION ............................................................................................... 12

IV.  PLAINTIFF FAILS TO SHOW DR. MATTHEWS' DAMAGES
     MODELS ARE ADMISSIBLE ........................................................................................... 13

CONCLUSION .................................................................................................................................. 14

Defendant B&G Foods, Inc. ("B&G Foods) respectfully submits this reply in support of its Motion to Exclude the Declaration of Andrea Lynn Matthews, Ph.D.

**INTRODUCTION**

Plaintiff's Opposition fails to address many of the critical defects identified in the moving papers and does not contain any declaration from Dr. Matthews that even tries to rebut Dr. Palmatier's catalogue of reasons why her opinion is inadmissible. Neither Dr. Matthews, nor the lawyer arguments in the Opposition, explain why she chose to conduct two convoluted, multi-step surveys that avoid answering the basic question of whether the labeling at issue made any difference to the purchasing decisions and willingness to pay among people who buy no-stick cooking spray. Nor do they explain why Dr. Matthews chose to ignore the context of the product, made no effort to look at the market or how similar products are promoted, and did not consider why people buy cooking spray, which often has to do with its effectiveness in preventing sticking and their desire to avoid the fat or calories in butter. (Palmatier Decl. ¶ 7.)

As to Plaintiff's ability to satisfy *Comcast*, the Opposition fails to defend, or even explain, Dr. Matthews' claim that she could someday validly calculate whether anyone paid a "price premium" by using some generic form of regression, based on evidence she does not have and never has seen. Moreover, it offers no explanation, much less evidence, for how any reasonable person, much less a supposed expert, could validly show that anyone paid a price premium, when public information available before this suit was filed shows that the accused "butter spray" costs half the price of its main competitor's "butter flavor" spray.

The Opposition admits that the Matthews surveys were based on labels that were never actually on the product, emphasized certain portions of the label while hiding others, asked some participants questions without showing them the label at all, contained self-contradictory and

leading questions, and did not properly control for any one factor. The lawyer arguments in the Opposition fail to address, much less justify, many of these invalidating failures. Nor do they address the case law holding that any one of these defects, alone, renders her opinion inadmissible.

On the issues where the Opposition provides any response, the lawyer arguments fail to meaningfully rebut the expert Declaration of Dr. Palmatier (which is not cited once in the Opposition). For example, Plaintiff argues that the reason Dr. Matthews neglected to use the actual label in her survey is that the real label was hard to read. (Opp. at 5.) That is not an accepted principle of marketing science, and if true, would only go to prove that the part of the label that Dr. Matthews improperly led participants to focus on was inconsequential to real world decision making. Similarly, the Opposition argues that distractor tasks can be used in surveys (Opp. at 3-4), but fails to address that at her deposition. Dr. Matthews could cite no academic support for using a "distractor" task that involves the same subject as the survey—which defeats the purpose of a distractor task, and in fact primes the participants. The academic sources cited in the Opposition actually warn against precisely what Dr. Matthews did.

Plaintiff argues that the numerous flaws in Dr. Matthews' declaration only go to the weight of her testimony, not admissibility. (Opp. at 6-7.) But Plaintiff cites no authority, and B&G Foods is aware of none, in which a consumer survey that included priming, the wrong label, leading questions, invalid stimuli, confusing instructions, and no control was ever admitted. Nor does Plaintiff cite any authority that would allow an expert to offer an opinion that is not based on the facts of the case and was crafted without reviewing any of the evidence.

For these reasons, and the reasons in the Motion, Dr. Matthews' testimony should be excluded.

**ARGUMENT**

I.  **PLAINTIFF FAILS TO SHOW THAT DR. MATTHEWS' METHODOLOGIES ARE RELIABLE**

Dr. Matthews offers no justification for why she ignored the context of the marketing that she seeks to offer opinions about, failed to study the consumers that she is purporting to assess and chose instead to conduct two surveys that do not address the fundamental question in this case. Moreover, Plaintiff's Opposition does not address, much less show, that Dr. Matthews' survey methodologies satisfy any of the well-settled principles for a reliable consumer survey, including that a survey must avoid leading questions, replicate market conditions, employ sound interview procedures, and ensure the process is objective. (Mot. at 5 (collecting cases).) Plaintiff does not cite to the declaration of Dr. Palmatier or attempt to refute his criticisms of Dr. Matthews' methodologies. Indeed, Plaintiff largely ignores the methodological flaws highlighted in the Motion, including its use of leading questions, its failure to use proper controls, or the fact that one experiment did not show consumers a label and instead a table with conflicting instructions. (Mot. at 10-12.) Any one of these reasons, alone, requires exclusion of Dr. Matthews' declaration.

   A.  **Plaintiff Fails to Show Dr. Matthews Survey Was Unbiased**

In its Motion, B&G Foods identified five sources of bias in Dr. Matthews' survey: (1) her use of a priming distractor task, (2) her use of leading stimuli in Exhibit 1, (3) her use of an invalid stimulus in Experiment 2, (4) her use of confusing instructions in Experiment 2, (5) and her use of leading questions throughout the survey. (Mot. at 5-11.) Plaintiff's Opposition addresses only the first two of these flaws and ignores the rest.

3

### 1. Dr. Matthews' Improper Distractor Task

Plaintiff asserts that Dr. Matthews' use of a distractor task was permissible because such tasks are "commonly used" and "should be realistic." (Opp. at 3, 4.) But it does not explain why one would be necessary here given that the subject of the survey was unknown to participants, and none of the participants had any reason to suspect the purpose of Dr. Matthews' survey before taking it. (Palmatier Decl. ¶ 83.) Moreover, the Opposition does not address that a distractor task must be just that—a task that distracts, or draws the participants' attention away from anything having to do with the actual survey; not a task that involves the same types of questions or subjects in the actual survey. (*Id.*) None of the authorities Plaintiff cites in his Opposition supports the proposition that a survey can use a distractor task that involves subject matter that relates to what the survey is purporting to assess. To the contrary, the undisputed expert testimony is that doing so improperly primes participants. (*Id.* ¶¶ 81-84.)

The Opposition cites to the Sage Encyclopedia of Communication Research Methods ("Sage Encyclopedia") at 360 to support Dr. Matthews' choice of a distractor task. (Opp. at 3.) But the portion cited describes outright deception in research, not distractor tasks.[1] In fact, the Sage Encyclopedia warns about the danger of priming like Dr. Matthews did in her survey. *Id.* at 1699 ("The order in which questions are presented in a survey may influence respondent answers. Former questions may prime—or draw a respondent's attention to—certain information or attitudes, which the respondent may then think about when answering subsequent

---

[1] One notorious example of deception in research is the Milgram Experiment, in which participants were deceived into believing they were administering electric shocks to another participant. The Encyclopedia notes that there is an ongoing debate about whether deception in research is ethical, and cautions researchers to avoid it except when there is no alternative means of conducting the research and the benefit of the research exceeds the harm caused by the deception. Allen, Mike, The SAGE Encyclopedia of Communication Research Methods (2017) at 362-63.

questions."). The Sage Encyclopedia cites as one example a survey where some participants were asked whether politicians were trustworthy, while other participants were first asked about the trustworthiness of President Richard Nixon and then asked about the trustworthiness of politicians generally. The second group rated politicians as much less trustworthy because they were primed to think about the Watergate scandal. Dr. Matthews' survey is similar: after asking participants what they thought of a "bacon-flavored" no-stick spray, they were then asked whether they cared if a label said "butter" or "butter flavor."

The Opposition (unsupported by any expert declaration) claims that distractor tasks should be "realistic" in the sense that they must closely mimic the actual subject of the survey. (Opp. at 4.) As support, it cites Kathryn Whitenton's article "How to use Screening Questions to Select the Right Participants for User Research." (*Id*.) This article does not describe distractor tasks, but rather "Distractor Answer Choices." Distractor answer choices "are incorrect answer choices which camouflage the right answer by surrounding it with incorrect responses." Kathryn Whitenton, *How to Use Screening Questions to Select the Right Participants for User Research*, Nielsen Norman Group (July 14, 2019), https://www.nngroup.com/articles/screening-questions-select-research-participants/. Because they are meant to obscure the correct answer to a multiple-choice question, distractor answer choices should be realistic so that they do not tip off the participants that they are incorrect (e.g., if a survey is asking participants their preferred method of commuting, options like "car" or "train" would be good distractor answers, while "hang glider" or "Yevgeny Prigozhin's private plane" would be bad distractor answers). This miscited article has nothing to do with distractor tasks, which are meant to be discrete assignments unrelated to the actual survey questions that help obscure the survey's objective. (Mot. at 6; Palmatier Decl. ¶¶ 81, 84.) The Opposition fails to offer any support for using a distractor task

5

involving the same subject matter, just as Dr. Matthews failed to do at her deposition. (Matthews Dep. at 50.)

Alternatively, Plaintiff argues that the priming distractor task did not introduce bias because the "central" question in her survey was whether or not the product contained actual butter. (Opp. at 4.) But her survey questions and stimulus repeatedly used the word flavor, as did her distractor task, which invalidates anything her survey might be trying to study, especially conclusions about the ingredients or taste of the product, because consumers could be basing their answers based on the priming. (Palmatier Decl. ¶¶ 81-84.) By using an unnecessary distractor task that first asked participants what they thought of a bacon flavor spray, Dr. Matthews primed them to think about flavor when answering the actual survey questions about butter flavor.

### 2. Dr. Matthews' Use of Leading Stimulus in Experiment 1

Plaintiff's Opposition also fails to show that Dr. Matthews' use of fictional labels that were cropped and featured call outs highlighting certain language produced reliable results.

#### a. Dr. Matthews' Use of Fictional Labels

Plaintiff concedes that Dr. Matthews' survey did not use the actual product labels. (Opp. at 5.) As set forth in the Motion at 8, and ignored by Plaintiff, this is a fatal flaw because the unrefuted expert testimony is that "[n]o valid conclusion can be derived from substituting language that does not appear on the label in question." (Palmatier Decl. ¶ 87.); *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 238-39 (S.D.N.Y. 2010) (excluding survey that omitted portions of labels).

The Opposition argues that Dr. Matthews' use of a fictional label is immaterial because the actual label is hard to read. (Opp. at 5.) This is not a valid scientific methodology. (Palmatier Decl. ¶ 87.) And if Plaintiff were correct that the real label was hard to read, then there would be

6

no basis for intentionally directing participants to look at the blown-up language Dr. Matthews substituted for the real language in trying to assess consumer behavior in the real world.

Plaintiff also suggests that the difference in wording between the actual label, which said "natural and artificial flavor," and the wording used by Dr. Matthews, "naturally and artificially flavored," is immaterial. (Opp. at 5.) But nobody has ever studied this.[2] Marketing science is based on the idea that the actual wording used on a label is what matters. (Palmatier Decl. ¶ 87.) Substituting language that does not appear on the product for no valid reason, just like making multiple changes to the stimuli shown to different groups, does not yield reliable results that isolate the effects of the language being studied. Even Dr. Matthews admitted that using different language could have led to a different result. (Matthews Dep. at 58-59.) This is a separate and independent reason to exclude Dr. Matthews' survey.[3]

      b.  **Dr. Matthews Artificially Focuses on One Part of the Label**

Plaintiff contends that Dr. Matthews' use of call-outs to highlight the "naturally and artificially flavored" language was appropriate because "the central issue is that Defendant's Product does not contain butter." (Opp. at 6.) This argument fails to address the undisputed expert testimony that emphasizing to participants the words "naturally and artificially flavored"

---

[2] Moreover, "flavored" does not mean the same thing as "flavor." Flavor connotes an ingredient, whereas flavored describes a process. "Flavored." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/flavored ("having an added flavor or a specified flavor").

[3] Plaintiff also asserts that use of a fictional label was warranted to eliminate potential biases arising from respondents' perception of the Crisco® brand generally. (Opp. at 4-5 (citing Gacula Jr., M. C. *et al.*, "Some sources of bias in consumer testing," J. of Sensory Studies 1.2 (1986): 175-82; H.R. Moskowitz, Product Testing and Sensory Evaluation of Foods, Food and Nutrition Press, Westport, CT (1983)). While this may account for Dr. Matthews' use of the fictional "First Choice" brand name in one version of Experiment 1, it does not account for her use of the phrase "naturally and artificially flavored," which was not linked to any brand name and appeared on both versions of Experiment 1 in any event.

plainly biases respondents in a way that allowing them to examine the entire label would not. (Palmatier Decl. ¶ 89.)

*Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239 (S.D. Ill. 2015), on which Plaintiff relies (Opp. at 7), does not endorse using leading stimulus in a survey. In fact, it did not involve a survey at all; it involved an in-person study of 23 people in which the expert claimed to derive *qualitative*, as opposed to statistical, facts to buttress his opinions, which were based on "Defendants' own market research" and "hundreds of consumer complaints." *Id*. at 245. The Court explained: "Defendants argue that these opinions must be excluded because they are not based on evidence of actual consumer perceptions, like a survey. The Court disagrees. A consumer survey is not the only acceptable evidence of consumer deception." *Id*. Nothing in *Suchanek* purports to authorize conducting a biased survey, especially where, as here, the survey is literally the only evidence relied upon, and there is no evidence that B&G Foods conducted its own internal analysis of using the term "butter" instead of "butter flavor," and no evidence of any consumer complaints, much less hundreds of people calling the product "a hoax, deceptive, an absolute fraud, a rip off, a sad joke, a gross misrepresentation, a clearly substandard," as consumers had with the coffee pods at issue in *Suchanek*. *Id*. at 235.

Alternatively, Plaintiff argues that limiting respondents' view of the label "was consistent with Plaintiff's purchase experience." (Opp. at 6.) Leaving aside that Dr. Matthews never talked to Plaintiff, nor read his deposition, the fact that Plaintiff claims to have looked at just one portion of the label does not mean other consumers behave the same way. Indeed, the ostensible purpose of the survey is to test whether consumers would react like Plaintiff did when presented with the label. Constraining their review to just the portions Plaintiff thinks are important is precisely the opposite of what an unbiased surveyor is supposed to do—especially where, as

8

here, the portions of the label that Dr. Matthews withheld from participants expressly state that the product does not contain butter. (Mot. at 8-9 (collecting cases excluding surveys that used only portions of labels or otherwise failed to replicate market conditions)).

### 3. Plaintiff Fails to Address Other Sources of Bias in Dr. Matthews' Survey

Plaintiff does not address the three other sources of bias in Dr. Matthews' survey, including her failure to use any label at all in Experiment 2, her use of conflicting instructions in Experiment 2, or her use of leading questions throughout the survey. As set forth in the Motion at 10-11 and in the unrebutted testimony of Dr. Palmatier, each of these failures separately and independently renders Dr. Matthews' survey unreliable.

### B. Plaintiff Fails to Show Dr. Matthews' Survey Used Proper Controls

As detailed in the Motion at 11-12, and unaddressed in the Opposition, Dr. Matthews' survey is separately unreliable because she failed to use proper controls. Instead, her "control condition" changed the label in two distinct ways and changed the phrasing of the questions as well. As Dr. Matthews admitted in her deposition, all these changes to the control condition make it impossible for the survey to isolate the effect of any single representation. (Matthews Dep. at 75-78.) Failure to use proper controls is a separate and independent basis for exclusion of a consumer survey. (Mot. at 12 (collecting cases).)

### C. Dr. Matthews' Survey Is Too Unreliable to Be Admissible

The motion establishes that the methodological flaws in Dr. Matthews' survey renders it too unreliable to be admitted. Plaintiff does not attempt to distinguish the authority cited in the Motion requiring surveys that use the wrong labels, withhold the complete labels from participants, ask confusing or leading questions, or fail to use proper controls should be excluded. (Mot. at 5-12.)

9

Instead, Plaintiff, relying on *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 246 (S.D. Ill. 2015), argues that these flaws go to weight, and not admissibility. For the reasons discussed above, however, *Suchanek* does not support that conclusion. *Suchanek* did not involve a statistical survey; it involved a qualitative study. And the study was done to corroborate the expert's review of the labels themselves, the defendants' own internal marketing studies and documents, and a deluge of consumer complaints demonstrating that people were misled. There is no such evidence in this case, and Dr. Matthews did not even review the product labels at issue. (Matthew Dep. at 62.)

The Opposition does not address, much less distinguish, the cases cited in the moving papers at 4-12, which set out the standards for evaluating the reliability of consumer surveys. *See Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 849-50 (N.D. Ill. 2018) (noting that "Courts in this district" look to the factors in the Manual for Complex Litigation (Fourth) § 11.493 in evaluating the admissibility of consumer surveys). All those decisions support the exclusion of Dr. Matthews' declaration in its entirety. *E.g.*, *FTC v. Nat'l Urological Grp., Inc.*, 2017 WL 6759868, at *43 (N.D. Ga. Oct. 10, 2017) (excluding survey that was biased due to improper priming of participants); *THOIP*, 690 F. Supp. 2d at 238-39 (excluding survey that omitted portions of labels); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 452-53 (D.N.J. 2009) (excluding survey that use cropped and out-of-context images of label); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (excluding survey that only asked participants about isolated part of the packaging); *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008-09 (N.D. Ill. 2010) (excluding survey that asked confusing questions); *Wallace v. Countrywide Home Loans, Inc.*, 2012 WL 11896333, at *5 (C.D. Cal. 2012) (same); *Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, 2012 WL 1833877, at

10

*8 (M.D. Ga. May 18, 2012) (same); *Kargo Global, Inc. v. Advance Magazine Publ'rs, Inc.*, 2007 WL 2258688 (S.D.N.Y. 2007) (survey question that draws connections not made by consumers in marketplace inadmissible); *Simon Property L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1047 (S.D. Ind. 2000) (excluding survey that failed to use proper controls); *Hill's Pet Nutrition, Inc. v. Nutro Pods, Inc.*, 258 F. Supp. 2d 1197, 1204 (D. Kan. 2003) (same).

## II. PLAINTIFF FAILS TO SHOW THE SURVEY IS USEFUL

As set forth in the Motion at 12-13, and expressly conceded by Plaintiff, Dr. Matthews' survey sheds no light on whether the phrase "butter no stick spray" affected consumer behavior (Opp. at 7) because Dr. Matthews admitted "people could buy the product for any number of reasons". (Matthews Dep. at 70-71.) Plaintiff's Opposition does not address the authority cited in the Motion excluding similar surveys that failed "to show any relation between the falsity, if any, of defendant's advertising, and any decision to purchase by any consumer." *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1207 (D. Kan. 2003); *Weaver v. Champion Petfoods USA Inc.*, 2019 WL 7370374, at *4 (E.D. Wisc. Dec. 21, 2019) (excluding survey that did "not test the effect of the [allegedly misleading] statements on consumers' purchasing decisions).

Plaintiff argues that, nonetheless, Dr. Matthews' survey is useful because it does address consumers' "likelihood of believing that the Product contained butter." (*Id.*) This is incorrect for the reasons above—it did not reliably assess anything—and beside the point. The question in this case is whether Plaintiff can reliably show that a class of consumers was materially misled to their detriment by the language in question. This question is easily answered, as Dr. Palmatier did by simply asking consumers two non-leading questions (1) how interested they were in buying the product and (2) how much would they pay. His study controlled for one factor: the

11

language in question. The Opposition does not explain why the Matthews surveys were designed to avoid answering either of these questions.

Citing *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 4398011 (N.D. Ill. Aug. 18, 2016) (St. Eve, J.), Plaintiff asserts that an expert need not have an opinion on the "ultimate question" for their testimony to be useful. (Opp. at 7.) But in that case, a civil rights lawsuit arising out of a wrongful conviction, the expert offered an opinion on the reliability of eyewitness testimony which formed the basis for the plaintiff's conviction. While the expert could not say whether or not the police officers intentionally violated plaintiff's rights (the ultimate issue in the case), the Court found his testimony would still be helpful to the jury in evaluating whether the plaintiff's conviction was based on unreliable evidence. *Id.* at *9-10.

Here, by contrast, there is no issue on this case on which Dr. Matthews' testimony would be useful. Her survey did not study whether consumers were interested in buying the product or how much they would pay. Her survey did not ask participants any questions about the actual labels at issue. She did not review any evidence in the case. She asked survey participants about whether they thought a fictional product contained butter. That is not useful.

### III. DR. MATTHEWS' TESTIMONY LACKS A RELIABLE FOUNDATION

Plaintiff admits that Dr. Matthews did not review anything other than the complaint to prepare her opinions. (Opp. at 8.) For this reason, as set forth in the Motion and ignored by Plaintiff, Dr. Matthews' opinions are inadmissible *ipse dixit*. (Mot. at 14 (collecting cases).)

Plaintiff argues that Dr. Matthews' assumptions are not so speculative as to warrant exclusion of her testimony. (Opp. at 8.) None of the cases on which Plaintiff relies, however, involved an expert who only reviewed the complaint. *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005) (expert relied on information supplied by plaintiff's employees); *Nat. Res. Def. Council v. Illinois Power Res. Generating, LLC*, No. 1:13-

12

cv-1181, 2018 WL 5777476, at *4 (C.D. Ill. Nov. 2, 2018) (expert relied on national survey data to make assumption about toxicity of particulate matter); *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 765-66 (7th Cir. 2013) (in case about whether table saw manufacturer should have installed brake to prevent injuries, plaintiff's expert's assumptions were based on industry data and testimony of another witness). Dr. Matthews' failure to review the labels, or any other evidence in the case, means that there is no "rational connection" between the data and her opinion that could render the opinion reliable. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017). This is a separate and independent basis for the exclusion of Dr. Matthews' testimony.

## IV. PLAINTIFF FAILS TO SHOW DR. MATTHEWS' DAMAGES MODELS ARE ADMISSIBLE

The Motion also establishes at 14-15, and Plaintiff again does not address, that "boilerplate opinions" about how damages could possibly be calculated are not admissible because they fail to satisfy the plaintiff's burden to prove that a scientifically valid method exists for establishing class-wide damages under *Comcast*. Plaintiff, relying on *Eike v. Allergan, Inc.*, No. 12-cv-1141-SMY-DGW, 2016 WL 4272127 (S.D. Ill. Aug. 15, 2016), *vacated and remanded*, 850 F.3d 315 (7th Cir. 2017), argues that the question of whether the damages model is accurate is one for the finder of fact. In *Eike*, however, the Court (not a jury) found that plaintiff's proposed methodology did satisfy *Comcast*, and the methodology, itself, was reasonable. *Id*. at *6. *Eike* was not a food labeling case, and did not involve regression analysis or any other complicated damages model. The case involved an eye dropper that was allegedly designed too large so that plaintiffs wasted eye drops and thus overpaid, and the expert proposed a damages model based on multiplying the average eye drops wasted by their retail cost. *Id*.

13

Here, by contrast, rather than proposing a concrete methodology as the expert did in *Eike*, Dr. Matthews merely asserts she could construct a conjoint or hedonic analysis without identifying any of the pertinent data she would use, the variables she would employ in her models or the images she would show consumers in the conjoint study. Plaintiff cannot even cite any cases endorsing these methodologies in food labeling cases, and as pointed out in the moving papers and ignored by Plaintiff, several courts have outright rejected these methods in this context. In any event, Dr. Matthews' generic proposal is not a valid expert opinion for the reasons cited in the moving papers. *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 550 (C.D. Cal. 2014) (excluding expert who merely claimed to be able to perform a conjoint or hedonic analysis).

Further, the Opposition does not discuss how Dr. Matthews' proposed methodologies would address, much less overcome, the simple fact that the product in suit is sold for almost half the price of PAM, its chief competitor, which labels its product as "butter flavor" spray, or how under such circumstances, there could ever be a reliable way to prove a price premium.

## CONCLUSION

The Matthews Declaration is not scientifically valid. Her methodologies were designed to avoid the fact that many spray oil purchasers, unlike other consumers, do not want the fat or calories in butter, and buy spray oil for its effectiveness rather than butter content. She deliberately chose these convoluted techniques to bias the results, and offers no apologia in response to the lengthy and unrebutted criticisms of Dr. Palmatier. For the foregoing reasons, the Matthews declaration should be excluded.

Dated: August 25, 2023  Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

Matthew Borden, Esq. (*Pro Hac Vice*)
David H. Kwasniewski, Esq. (*Pro Hac Vice*)
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808
borden@braunhagey.com
kwasniewski@braunhagey.com

Stephen Michael Donnelly
sdonnelly@plgfirm.com
PARIKH LAW GROUP, LLC
150 S. Wacker Drive, Suite 2600
Chicago, IL 60606
Telephone: (312) 725-3476
sdonnelly@plgfirm.com

*Attorneys for Defendant B&G Foods, Inc.*